# HOWARD v. UNITED STATES.

## ERROR TO THE UNITED STATES CIRCUIT COURT OF APPEALS FOR THE EIGHTH CIRCUIT.

No. 121.    Argued January 20, 1902.—Decided March 24, 1902.

This suit was upon a bond taken by a Circuit Court of the United States from its clerk, to secure the proper performance of his duties, and the Circuit Court could take cognizance of it, independently of the citizenship of the real parties in interest, as it was a suit arising under the laws of the United States, of which the Circuit Court was entitled to take original cognizance, concurrently with the courts of the State, even if the parties had been citizens of the same State; and, although the petition shows a case of diverse citizenship, jurisdiction was not dependent upon such citizenship.

That the clerk of the court was authorized, with the sanction or by order of the court, to receive money paid into court in a pending cause, is clearly to be implied from the legislation of Congress referred to in the opinion of the court.

Congress, by the statutes referred to in the opinion of the court, intended the bond of a clerk of a Circuit Court should be for the protection of all suitors, public or private.

As the clerk had the right to receive the money in question; as he failed, to the injury of the suitor from whom he received it, with the sanction of the court in a pending cause, to deposit it as required by law, and appropriated it to his own use; and as his bond was for the protection of private suitors as well as for the Government, there is no sound reason why the plaintiff could not enforce his rights by a suit in the name of the United States for his benefit.

THE case is stated in the opinion of the court.

*Mr. John C. Gage* for plaintiffs in error. *Mr. Sanford B. Ladd* and *Mr. Frank Hagerman* filed a brief for same.

*Mr. Edwin A. Krauthoff* for defendant in error. *Mr. J. V. C. Karnes, Mr. Alexander New* and *Mr. David D. Stewart* were on his brief.

MR. JUSTICE HARLAN delivered the opinion of the court.

Were the appellants entitled, of right, to bring this case here

from the Circuit Court of Appeals? Has a clerk of a Circuit Court of the United States authority to receive money brought into court by a private suitor, and is he responsible upon his bond if he does not deposit it as required by statute and appropriates it to his own use? Is the bond of the clerk for the protection of private suitors as well as of the United States? Has a private suitor the right without express statutory authority to sue on the bond of the clerk in the name of the United States for his benefit?

These questions are presented by the record, and will be examined after we shall have stated the facts set out in the special findings made by the Circuit Court.

On the 3d day of March, 1887, Warren Watson was duly appointed clerk of the Circuit Court of the United States for the Western Division of the Western District of Missouri; and on the same day he executed and the court approved his bond to the United States in the penalty of twenty thousand dollars.

He died March 24, 1892, while acting as clerk, and an administrator of his estate was appointed April 2, 1892. Notices, as required by the local law, having been previously given for the presentation of claims, the administration of the estate was closed and the administrator discharged on the 11th day of September, 1894. At no time did the United States or the relator Stewart exhibit or present any claim against Watson's estate.

Stewart instituted, February 6, 1891, in the Circuit Court of the United States a suit at law against Henry County, Missouri, upon three bonds of the county, two for $1000 each and one for $500. His petition contained three counts. In the first count he asked for judgment for $1010 with interest from September 1, 1887, as the amount due on the first bond of $1000. The second count was upon the other bond for $1000; the third, upon the $500 bond.

On the 3d day of March, 1891, the county filed its answer alleging as to the first count that on September 6 [1], 1887, there was due on the bond therein referred to $1010, and on that date it had deposited that sum in the National Bank of Commerce of New York for the payment of the bond and interest,

and tendered the same to the plaintiff as full payment thereof, but that the plaintiff had refused to accept such payment. The answer further alleged that the defendant had "at all times been ready and willing to pay plaintiff said sum of $1010 in full payment of said bond and unpaid interest, and now here again tenders to plaintiff said sum of $1010 in full payment of said bond and unpaid interest due thereon, on September 6, [1], 1887, and *now brings the said sum into court.*" The answer to the second and third counts was exactly the same, except that as to the third count the amount named was $505 instead of $1010.

On the same day, March 3, 1891, there was entered on the records of the court in said cause the following order: "This day comes defendant by its attorney and files answer and tenders to the plaintiff and *deposits with the clerk* the sum of $2525 in payment and satisfaction of his cause of action in the petition set forth. Thereupon a stipulation waiving a trial by jury is filed herein."

It was found as a fact that Henry County did hand to Watson the sum of $2525 as recited in that order.

On June 27, 1891, Stewart, the plaintiff in that suit, filed a reply, which was a general denial of the facts alleged in the answer.

On July 2, 1894, more than two years after Watson's death, there was entered on the records of the court in the cause the following: "This day come the parties by their attorneys, the plaintiff by Karnes, Holmes & Krauthoff, and the defendant by M. A. Fyke, and a stipulation waiving a jury having been heretofore filed herein, the hearing of this cause is proceeded with before the court. Thereupon evidence is heard and the case is submitted to the court and by the court taken under advisement with leave to the parties to file briefs."

On the 11th day of February, 1895, the following order was made in that case: "A jury having heretofore been waived in writing by the parties hereto, and this cause having been submitted to the court on the pleadings and evidence and argument of counsel, and taken under advisement by the court, and the court being now fully advised in the premises, doth find the

issues as follows, to wit : On the first count of the petition the court finds that the principal and interest on bond No. 204 was duly tendered by defendant at the place of payment on the first day of September, 1887, and that after the plaintiff instituted this action in this court, and at the filing of the answer herein, the defendant duly paid said sum into court for the use and benefit of plaintiff, and that plaintiff is entitled to judgment therefor on the first count of the petition in the sum of $1010." The findings on the other counts differed only as to amounts.

The order in the same case then proceeded : "It is therefore ordered and adjudged by the court that the plaintiff have judgment for the recovery of the sum of twenty-five hundred and twenty-five dollars ($2525), the aggregate amount found to be owing to him under the three counts of the petition, and that plaintiff pay the costs of this action and that execution issue therefor. And it further appearing to the court that the said sum of $2525, so paid into court as aforesaid, was paid to and received by Warren Watson, the then clerk of this court, who has since departed this life without having accounted for said sum of money so received by him as said clerk, and that said money has never been turned over to his successor in office, the present clerk of this court, nor has the same been otherwise accounted for by said Warren Watson as clerk, or otherwise : It is found and adjudged by the court that the plaintiff is entitled to have and recover said money so received by said Warren Watson as clerk aforesaid, and plaintiff is authorized to proceed therefor on the bond of said Warren Watson given as clerk as aforesaid."

No appeal was taken from this judgment, and the same became final and remained in full force and effect and unpaid.

No order or direction as to this money was ever made except as indicated in the order of February 11, 1895.

When the $2525 was paid by Henry County to Watson, he deposited it the same day in a bank *to his individual credit*, and it was not at any time treated by him as in the depository of the court. He never presented to the court any account of the money, nor paid it either to Henry County or to Stewart. During the pendency of the Stewart suit against the county

neither party took any steps for an order in relation to the money, other than was actually made as above stated, nor made any objection to the method in which the money was received. Stewart, however, had no knowledge of the acts of Watson.

It was further found that no demand was ever made on the defendants or on Watson for the money other than is to be inferred from the institution of the suit.

The present action was brought October 19, 1895, against the sureties in Watson's bond, in the name of the United States, at the relation and to the use of David D. Stewart. One of the sureties, McDonald, pleaded his discharge in bankruptcy, and that plea was sustained. Judgment was entered against the sureties (except McDonald) for the sum of $2525 with interest at six per cent from the commencement of this suit, making total of $3057.77. 93 Fed. Rep. 719. That judgment was affirmed in the Circuit Court of Appeals. 102 Fed. Rep. 77.

1. The first question is one of the jurisdiction of this court. The defendant in error insists that the judgment of the Circuit Court of Appeals was final, and that therefore no writ of error lay to this court.

Is this a correct interpretation of the statutes defining and regulating the jurisdiction of the courts of the United States?

In all cases in which the judgments of a Circuit Court of Appeals are not made final by the act of March 3, 1891, c. 517, there is of right an appeal or writ of error to this court where the matter in controversy exceeds one thousand dollars in value besides costs. 26 Stat. 826, 828.

Among the cases in which the judgments or decrees of the Circuit Courts of Appeals are made final are those in which the jurisdiction of the Circuit Court " is dependent entirely upon the opposite parties to the suit or controversy being aliens and citizens of the United States or citizens of different States." 26 Stat. 828, § 6.

The opposite parties here are Stewart, the relator, a citizen of Maine, for whose benefit the suit was brought, and the sureties on the bond of Watson, who are all citizens of Missouri. The Government is the nominal, while Stewart is the real, plaintiff. His citizenship is to be regarded in any inquiry as to

jurisdiction. *Browne* v. *Strode*, 5 Cranch, 303; *McNutt* v. *Bland*, 2 How. 9; *Maryland* v. *Baldwin*, 112 U. S. 490.

But does it not appear from the petition itself that the case was one of which the Circuit Court could take cognizance independently of the citizenship of the real parties in interest? This question must receive an affirmative answer. The suit was directly upon a bond taken by the Circuit Court in conformity with the statutes of the United States, and the case depends upon the scope and effect of that bond and the meaning of those statutes. It was therefore a suit arising under the laws of the United States, of which the Circuit Court (concurrently with the courts of the State) was entitled to take original cognizance, even if the parties had been citizens of the same State. Act of August 13, 1888, 25 Stat. 434, c. 866. This court has heretofore decided that a suit upon a bond of a marshal of the United States was one arising under the laws of the United States. *Feibelman* v. *Packard*, 109 U. S. 421, 423; *Bachrack* v. *Norton*, 132 U. S. 337; *Reagan* v. *Aiken*, 138 U. S. 109; *Bock* v. *Perkins*, 139 U. S. 628, 630. The same principle must be held to be applicable to suits upon the bond of a clerk of a court of the United States. It could not be that a suit upon the bond of a marshal was one arising under the laws of the United States, and that a suit upon the bond of a clerk of a court of the United States was not of that class.

It results that although the petition shows a case of diverse citizenship, jurisdiction was not dependent entirely upon such citizenship. Jurisdiction was likewise invoked, and rightfully, upon Federal grounds. And as the case was one which could not have been brought here directly from the Circuit Court, the final judgment of the Circuit Court of Appeals could be reviewed in this court upon writ of error sued out by the defendants.

2. We now come to the merits of the case. The bond in suit was taken under the authority of section 795 of the Revised Statutes as amended by the act of February 22, 1875, c. 95, 18 Stat. 333. That section reads: " § 795. The clerk of every court shall give bond, in a sum to be fixed and with sureties to be approved by the court which appoints him, faithfully to dis-

charge the duties of his office, and seasonably to record the decrees, judgments and determinations of the court of which he is clerk; and a new bond may be required whenever the court deems it proper that such bond should be given. A copy of every bond given by a clerk shall be entered on the journal of the court for which he is appointed, and the bond shall be deposited for safekeeping as the court may direct. A certified copy of such entry shall be *prima facie* proof of the execution of such bond and of the contents thereof."

The conditions of the bond, as set forth in this section, were the same as those prescribed by the Judiciary Act of 1789. 1 Stat. 73, 76.

It will be observed that section 795 does not name the obligee in the bond, and leaves its amount to be fixed by the court. But the third section of the act of 1875 provided, as did the Judiciary Act of 1789, that the clerks should give bond to the United States. The act of 1875 also required bond "in the sum of not less than five nor more than twenty thousand dollars, to be determined and regulated by the Attorney General of the United States." And the same act authorized the Attorney General to require a bond in a sum not to exceed forty thousand dollars whenever the business of the court should make it necessary.

It must be taken as indisputable that the money in question was paid by Henry County in satisfaction of Stewart's claim or cause of action. It must also be taken as indisputable, upon this record, that the deposit was made with Watson as clerk in the presence and with the assent of the court, although no order was entered expressly requiring the money to be paid to the clerk or expressly directing him to receive it. But all this is necessarily to be implied from the terms of the order of March 3, 1891, which states that Henry County—presumably in the presence of the court—*deposited the money with the clerk.* It would be a very narrow interpretation of the words of that order to hold that the money was paid to Watson without the knowledge, approval or sanction of the court, or that it was paid to him as an individual and not in his capacity as clerk. The

order was equivalent to one expressly stating that the money was paid by direction of the court to Watson as clerk.

But it is suggested that in the absence of a statute distinctly so providing, the clerk was not entitled to receive the money deposited in payment and satisfaction of Stewart's claim. It is true that no statute declares in words that a clerk may receive money brought into court for the purposes of a pending suit. But it is clear that Henry County was entitled to bring into court and tender to its adversary the amount it was willing to pay in satisfaction of his claim. It cannot be that it was the duty of the judge of the court himself to have received the money and personally deposited it as required by law. No one has ever supposed that a judge was under obligation to perform such services. Who, then, was to receive the money? Plainly it was the duty of the clerk, who was the arm of the court, kept its records showing money paid in by suitors or officers, and was under bond conditioned that he would faithfully perform all the duties of his office. He was allowed by statute a commission "for *receiving,* keeping and paying out money in pursuance of any statute or order of court." Rev. Stat. § 828. It was well said by Judge Caldwell, delivering the unanimous judgment of the Circuit Court of Appeals, that "for more than a century the clerks of the Circuit Courts of the United States have been receiving and paying out the moneys of suitors in those courts in the usual and ordinary manner, and during that time neither the clerks nor the suitors nor the court ever dreamed that they were performing this service as private individuals, and were not officially responsible for the moneys they were receiving as such clerks."

That the clerk was authorized, with the sanction or by order of court, to receive money paid into court in a pending cause, is clearly to be implied from the legislation of Congress. It will be well to trace the history of this question through the statutes enacted from time to time.

By the act of March 1, 1793, c. 20, clerks of District Courts were allowed one and a quarter per cent commission on "all money deposited in court." 1 Stat. 332–3 ; 1 Stat. 625, c. 19, § 3. Money received by a marshal in a prize cause was held by

Mr. Justice Story to be properly paid over to the *clerk*, and that he was entitled to commissions under the statute. That practice, he held, was of great importance for the "security of suitors." *The Avery*, (1814), 2 Gall. 308, 311. See also *Blake* v. *Hawkins*, 19 Fed. Rep. 204; *In re Goodrich*, 4 Dill. 230; *Smith* v. *Morgan City*, 39 Fed. Rep. 572. In *Fagan* v. *Cullen*, 28 Fed. Rep. 843, 844, Mr. Justice Brown held that moneys received by the marshal should, under sections 995 and 996 of the Revised Statutes, either be immediately deposited by him "*or paid to the clerk* and by him deposited."

By an act approved April 18, 1814, c. 62, it was provided that upon the payment of money into a District or Circuit Court to abide the order of the court, the same should be deposited in an incorporated bank to be designated by the court, there to remain until it was decided to whom it of right belonged. If there was no such bank, then the court could "direct" the money to be deposited according to its discretion. 3 Stat. 127. Could not such direction have been given to the clerk?

The act of 1814 was supplemented by one approved March 3, 1817, c. 108, making it the duty of Circuit and District Courts " to cause and direct " all moneys remaining in such courts, and all moneys subject to their order, to be deposited in a branch of the Bank of the United States in the name and to the credit of the court. § 1. The same direction was given by the act as to all moneys thereafter paid into said courts, " or received by the officers thereof." § 2. All payments out of such moneys were to be entered of record by the clerk. § 3. It was further provided that if any " clerk of such court," or other officer thereof, " receiving any such moneys," should refuse or neglect to obey the order of the court for depositing the same, such clerk or other officer was liable to be forthwith proceeded against by attachment for contempt. § 4. The same act imposed upon the clerk the duty of presenting an account at each session of court, of all moneys remaining therein. § 5. 3 Stat. 395.

The acts of 1814 and 1817 were technically repealed by the act of March 24, 1871, entitled " An act relating to moneys paid into the courts of the United States. 17 Stat. 1, c. 2. But

the act of 1871 retained substantially all the provisions of the two former acts and added others. That act provided, among other things, that all moneys in the registry of any court of the United States, or "in the hands or under the control of an officer of such court, which were received in any cause pending or adjudicated in such court," should within thirty days after the passage of the act be deposited with the Treasurer, an assistant treasurer, or a designated depositary of the United States, in the name and to the credit of such court; that all such moneys which were thereafter paid into such courts, "or received by the officers thereof," should be forthwith deposited in like manner; that if any *clerk* or other officer of a court of the United States deposited any money belonging in the registry of the court in violation of that act, or should retain or convert it to his own use, or to the use of any other person, he should be deemed guilty of embezzlement, and on conviction be punished by a fine of not less than five hundred dollars and not more than the amount embezzled, or by imprisonment for a term of not less than one year nor more than ten years, or both, at the discretion of the court; and that if any person should knowingly receive from a *clerk* or other officer of a court of the United States any money belonging in the registry of the court as a deposit, loan or otherwise, in violation of the act, he should be deemed guilty of embezzlement, and be punished as therein provided.

These provisions of the act of 1871 have been substantially reproduced in the following sections of Revised Statutes:

"§ 798. At each regular session of any court of the United States the *clerk* shall present to the court an account of all moneys remaining therein, or subject to its order, stating in detail in what causes they are deposited, and in what causes payments have been made; and said account and the vouchers thereof shall be filed in the court."

"§ 995. All moneys paid into any court of the United States, *or received by the officers thereof, in any cause pending or adjudicated in such court,* shall be forthwith deposited with the Treasurer, an assistant treasurer, or a designated depositary of the United States, in the name and to the credit of such court: *Provided,* That nothing herein shall be construed to prevent

the delivery of any such money upon security, according to agreement of parties, under the direction of the court.

"§ 996. No money deposited as aforesaid shall be withdrawn except by order of the judge or judges of said courts respectively, in term or in vacation, to be signed by such judge or judges, and to be entered and certified of record by *the clerk;* and every such order shall state the cause in or on account of which it is drawn."

"§ 5504. Every *clerk* or other officer of a court of the United States who fails forthwith to deposit any money belonging in the registry of the court, or hereafter paid into court *or received by the officers thereof,* with the Treasurer and assistant treasurer, or a designated depositary of the United States, in the name and to the credit of such court, or who retains or converts to his own use or to the use of another any such money, is guilty of embezzlement, and shall be punished by a fine not less than five hundred dollars, and not more than the amount embezzled, or by imprisonment not less than one year nor more than ten years, or by both such fine and imprisonment; but nothing herein shall be held to prevent the delivery of any such money upon security, according to agreement, of parties under the direction of the court.

"§ 5505. Every person who knowingly receives, *from a clerk* or other officer of a court of the United States, any money belonging in the registry of such court as a deposit, loan or otherwise, is guilty of embezzlement, and shall be punished as prescribed in the preceding section."

The statutory provisions to which we have referred—taken in connection with section 828 of the Revised Statutes, giving commissions to clerks for *receiving,* keeping and paying out money in pursuance of any statute or order of court—show the relation in which clerks of District and Circuit Courts have always stood to moneys paid into court in pending causes. They manifestly proceed on the ground that money paid into court, under its sanction, may be received by a clerk, his duty upon receiving it being forthwith to deposit the amount with the Treasurer, assistant treasurer, or designated depositary of the United States, in the name and to the credit of the court.

As soon as he receives the money he becomes responsible for it under his bond, and that responsibility does not cease until he deposits it as required by law. If after receiving the money he appropriates it to his own use, or, which is the same thing, if he deposits it in bank to his individual credit, he becomes liable on his bond for the amount so misappropriated.

3. But it is said that the bond in suit having been given to the United States, it must be deemed an instrument for the sole benefit of the Government, and therefore no suit can be maintained on it for the benefit of an individual suitor, although such suitor may have been damaged by the failure of the clerk to discharge his duty. This results, it is supposed, from the fact that there is no statute expressly authorizing such a suit. If this position be well taken, it would follow that the bonds required to be given by clerks of the Federal courts are not in any case for the protection of private suitors. We are of opinion that Congress never intended that any such condition of things should exist, but intended that the bond of a clerk should be for the protection of all suitors, public and private, and to that end authorized his bond to be increased to forty thousand dollars. It is impossible to suppose that, when requiring a clerk to give bond to the United States "faithfully to discharge the duties of his office, and seasonably to record the decrees, judgments and determinations of the court," Congress had in mind the interests of the United States alone, and purposely refrained from making any provision whatever for the security of private suitors in the Federal courts. Such a conclusion would be inconsistent with the practice of a century, and would greatly surprise the profession. As may well have been anticipated when those courts were first established, the great mass of litigation in the District and Circuit Courts of the United States has always been between individuals, and consequently the words above quoted, it must be assumed, had reference to individual suitors as well as to the United States. In our opinion, the bond of the clerk is for the benefit of every suitor injured by the failure of that officer faithfully to discharge his duties or seasonably to record the decrees, judgments and determinations of the court. It must have been so understood

when the courts of the United States were established and provision made for the appointment of clerks who should be entitled to receive the moneys of suitors when paid into court under its sanction or pursuant to any statute.

A well considered case upon this general subject is that of *McDonald v. Atkins*, 13 Neb. 568. That was an action on a clerk's bond to recover the amount received by him from a sheriff who had collected it on an execution. The point was made that the clerk was not authorized by statute to accept payment of a judgment, and so the court of original jurisdiction held in that case. The Supreme Court of the State said : " No one can doubt, we think, that this ruling was in direct conflict with the general understanding of the legal profession of this State as to the duty of court clerks in the receipt and disbursement of money paid upon judgments, from the first organization of our judicial system, through all its changes, down to the present time. Indeed, we doubt exceedingly that any one, especially a practicing lawyer, has ever supposed that upon the rendition of a money judgment, the defendant could not prevent a further accumulation of costs and interests, and have a satisfaction legally entered of record, by at once paying to the clerk of the court the amount which it calls for. If he could not—if clerks are really without authority to receive money on judgments in their custody, then to whom, in the absence of the plaintiff and his attorney, could payment be legally made ? . . . While it is true that we have no statute which in express terms declares that the clerks of the several courts shall accept payment of judgments in their custody, it is very evident that the legislature contemplated and intended that they should do so. . . . And even in the absence of such provision, can it be doubted that a party against whom a money judgment is sought by action may, upon being summoned, pay the amount demanded 'into court,' and thereby prevent the making of any further costs? But how is it to be effected ? In the case of inferior courts—those not of record, and unprovided with clerks—the payment can, of course, only be made to the judge or magistrate in person; but in courts of record, where all the steps taken in the progress of the case, from the commencement to

the satisfaction of final judgment, are recorded and preserved, and where a clerk for the performance of this duty is specially provided, it is otherwise. In these courts payments of money are never made to the judge, but the uniform practice in this State has always been to make them to his clerk, to whose custody and care the files, records, and whatsoever else relates to cases in courts, are confided. And this practice, so universal, although not positively directed by any act of the legislature, conflicts with none, and, as we have shown, is recognized by and in perfect harmony with several." These observations are strikingly applicable in the present case.

Two cases often cited in support of the contrary view are *Commonwealth* v. *Hatch*, 5 Mass. 191, and *Crocker, Treasurer &c.*, v. *Fales*, 13 Mass. 260. These cases will be found, upon examination, to rest upon grounds not applicable here.

*Commonwealth* v. *Hatch* was a suit upon a bond given by an inspector of beef for the faithful performance of his duties. The suit was brought in the name of the Commonwealth for the benefit of one alleged to have been injured by the unfaithfulness of the inspector in his office. It was held that the action could not be sustained—the decision being placed, in part, upon the ground that it appeared " by the statute directing the bond, and by the bond, that it was given for the *sole* use of the Commonwealth." Surely, it cannot be said that it appears by the statutes and by the bond in the present case that it was given for the sole use of the United States.

*Crocker, Treasurer &c.*, v. *Fales* was an action upon a bond of a clerk in the penalty of $1000, the obligee being a county treasurer, and the action being in his name for the use of one claiming to be injured by his neglect to pay certain moneys that came to his hands. The court held that the action could not be maintained, assigning as reasons for that conclusion that there was " nothing in the act " under which the bond was taken shewing " a design to protect individual sufferers against the negligence of the clerk to pay over moneys which may come into his hands; " that the penalty—between fifty and three hundred pounds—was discretionary with the court, " the largest of these sums being wholly inadequate if it was intended

to cover all possible delinquencies of a clerk;" that the damages recovered by one plaintiff "might consume the whole penalty, and the public be left without any of the security which was intended for the preservation of the records;" and that, in addition, "the statute makes such an appropriation of the sum which may be recovered by the treasurer on a suit as is *wholly inconsistent with the supposition that an individual has an interest in the bond.*" Of course, these things cannot be predicated of the statutory provisions relating to the bonds of clerks of Federal courts, and therefore the case cited is not in point here.

The suggestion that the amount of the bond was insufficient to protect both the United States and private suitors is not controlling; for, by the act of March 3, 1863, c. 93, 12 Stat. 768, reproduced in section 795 of the Revised Statutes, the court could fix the amount of the bond, and require a new one whenever it deemed proper, and by the act of February 22, 1875, the Attorney General could require a bond for as much as forty thousand dollars.

4. A further contention is, that even if the bond was for the protection of individual litigants, it could not be put in suit by a private person, unless with the consent of the United States expressed in an act of Congress.

It is supposed that the case of *Corporation of Washington* v. *Young,* 10 Wheat. 406, 409, is authority for this position. That was an action brought in the name of the Corporation of Washington for the use of one McCue and others, to recover from a manager of a lottery scheme the prize drawn by the purchasers of a certain ticket. The lottery was drawn in pursuance of an ordinance of the Corporation, and the bond of the manager, in the penalty of ten thousand dollars, was conditioned "truly and impartially to execute the duty and authority vested in him by the ordinance." The suit was brought in the name of the Corporation without its previous assent. Upon examination of the record in that case it will be found that the lottery was drawn under an act of Congress, approved May 4, 1812, c. 75, amending the charter of the city of Washington, and which gave the Corporation of Washington power "to author-

ize the drawing of lotteries for effecting any important public improvement in the city which the ordinary funds or revenue thereof will not accomplish; provided, that the amount to be raised in each year shall not exceed the sum of ten thousand dollars; and provided also, that the object for which the money is intended shall be first submitted to the President of the United States, and shall be approved by him." Act of May 4, 1812, c. 75, 2 Stat. 721, 726, § 6. Chief Justice Marshall, speaking for the court, said: " They [the proprietors of the ticket] had undoubtedly ' a right to apply to the Corporation to direct the suit, and the Corporation could not, consistently with their duty, have refused such application,' if the purpose of the bond was to secure the fortunate adventurers in the lottery, not to protect the Corporation itself. But the propriety of bringing such a suit was a subject on which the obligees had themselves a right to judge. If the proprietors of one prize ticket had an interest in this bond, the proprietors of every other prize ticket had the same interest; and it could not be in the power of the first bold adventurer who should seize upon it, to appropriate it to his own use, and to force the obligees to appear in court as plaintiffs against their own will. No person who is not the proprietor of an obligation can have a legal right to put it in suit, unless such right be given by the Legislature; and no person can be authorized to use the name of another, without his assent given in fact, *or by legal intendment.*"

That case undoubtedly is authority for the proposition that, generally speaking, an obligation taken under legislative sanction cannot, in the absence of a statute so providing, be put in suit in the name of the obligee, the proprietor of the obligation, without his consent. But it also sustains the proposition that consent may, under some circumstances, be assumed to have been given; that is, may arise by legal intendment. In the case just cited it was deemed plain from the ordinance of the Corporation that the bond was taken, primarily at least, for its protection and not for the benefit of ticket holders. The object for which the Corporation was empowered to establish lotteries was in its nature temporary and local, namely, to aid in

making important public improvements. It was to secure the accomplishment of that object that the managers were required to execute a bond. It was not unreasonable to suppose that in taking such a bond the Corporation had in mind to protect itself in making the public improvements which it was authorized to undertake. In the present case, courts of the United States were established in order that its jurisdiction might be invoked by all entitled to do so, and the requirement that the clerk should execute a bond for the faithful discharge of his duties and for the seasonable recording of the judgments, decrees, and determinations of the court—no distinction being made between public and private suitors—was an assurance to all suitors that, within the limit of the penalty of any bond taken from him by the Government, their rights would be protected against any act or omission on his part resulting to their injury. By the terms of the statute a clerk's bond remained in the custody or subject to the order of the court. In our opinion, Congress intended that the required bond should protect private suitors as well as the United States, and therefore, no statute forbidding it, a private suitor may bring an action thereon for his benefit in the name of the obligee, the United States. Such must be held to be the legal intendment of existing statutory provisions. The United States, or rather the court which had custody of the bond, is to be regarded as a trustee for any party injured by a breach of its conditions.

Murfree in his Treatise on Official Bonds says: " § 323. It is usually provided in statutes authorizing official bonds to be required of state, county or municipal officers, that suits may be brought upon them in the name of the official obligee 'upon the relation' or 'to the use' of the party injured by the breach of the bond or interested in its enforcement. Whenever, however, this express provision is omitted in the statute itself the deficiency is supplied by the construction given to such statutes by the courts whenever a proper case for such a ruling is presented. In a Maryland case (1858), *State, use, etc.* v. *Norwood,* 12 Md. 177, 194, the court held that it was not necessary for a plaintiff before instituting a suit upon an official bond payable to the State, to obtain the State's permission to do so; and this

although there was in the statute which prescribed the bond no specific provision for making the bond payable to the State, or for giving the party interested the right to sue upon it. The court adds, however, that 'there is no doubt that it is incumbent on the party suing on the bond, to show that he has an interest in it, before he could recover in a regular trial prosecuted to verdict.' The *rationale* of official bonds is well expressed by the court in this case: 'The laws which provide for the execution of bonds similar to the one before us, do not require them for the purpose of protecting the rights of the State alone. They are also designed to secure the faithful performance of official duties, in the discharge of which individuals and corporations have a deep interest, and, therefore, they should have the privilege of suing [on] such bonds for injuries sustained by them, through the negligence and malconduct of the officers.'" The same author: "Many bonds of a strictly official character are executed by persons in places of public trust, prescribed by statute, and made payable to the 'State,' 'people,' or 'Commonwealth,' or else to the governor, president or other chief officer, which are designed not only to secure public interests, but to redress wrongs to individuals. Actions on such bonds must, of course, be brought in the name of the obligee, whether the object of the suit be to enforce the rights of the State or to protect private interests. In the latter case it is usual to bring the suit as by the obligee, 'at the relation' or 'for the use' of the real party in interest."

Stress is laid upon the fact that in the case of a marshal of the United States the statute expressly gives a right of action upon his bond to any one injured by his neglect of duty—the suit to be in the name of the party injured and for his sole use. Act of April 10, 1806; Rev. Stat. § 784; 2 Stat. 372, 374, c. 21. A similar provision is made in the case of consular officers who are required to give bond for the faithful performance of their duties—such suit to be in the name of the United States for the use of the person injured. Rev. Stat. § 1735. These provisions in relation to marshals and consular officers undoubtedly furnish some ground for the contention that Congress, having made no such express provision in the case of the bonds of

clerks, did not intend that private suits should be maintained upon their bonds. We are of opinion that this argument, although not without force, ought not to prevail against the legal intendment of the statutory provisions relating to clerks, who hold a peculiar relation to the courts appointing them, as well as to the public.

As the clerk had the right to receive the money in question; as he failed, to the injury of the suitor from whom he received it, with the sanction of the court in a pending cause, to deposit it as required by law, and appropriated it to his own use; and as his bond was for the protection of private suitors as well as for the Government, there is no sound reason why the plaintiff could not enforce his rights by a suit in the name of the United States for his benefit.

Perceiving no error in the record the judgment is

*Affirmed.*