UNITED STATES, for Use and Benefit of MIDLAND LOAN FINANCE CO., v. NATIONAL SURETY CORPORATION et al.

No. 3681.

District Court, D. Minnesota, Fourth Division.

May 16, 1938.

412

Leonard, Street & Deinard, of Minneapolis, Minn., for plaintiff.

M. J. Doherty, Pierce Butler, Jr., and R. O. Sullivan, all of St. Paul, Minn. (Doherty, Rumble, Butler, Sullivan & Mitchell, of St. Paul, Minn., of counsel), for defendant National Surety Corporation.

NORDBYE, District Judge.

The action was brought by the plaintiff, Midland Loan Finance Company, in the name of the United States as indicated above, to recover damages against the principal and surety on a postmaster's bond in the penal sum of $16,000.00, given in pursuance of 39 U.S.C.A. § 34. No consent to this suit by the United States has been obtained. The complaint sought to recover the sum of $34,997.03 against the principal and $16,000.00 against the surety. Subsequently, the plaintiff limited its right of recovery against both defendants to the amount of the bond.

Plaintiff was in the automobile finance business in the city of Minneapolis. It purchased contracts of sale made by various automobile dealers in this community. One Thomas Hunting was engaged in the automobile business at Montgomery, Minnesota, where the defendant Malone was Acting Postmaster. During the period in question, Hunting solicited plaintiff to purchase conditional sales contracts, including the promissory notes evidencing the obligation of the purchasers to pay the deferred installments thereon. It appears that Hunting became engaged in the practice of making out false and forged conditional sales contracts and notes which were tendered for sale to the plaintiff. In carrying on its business with Hunting, plaintiff had a certain established practice with reference to the investigation of the purchasers named in the contracts tendered to it. Letters were mailed out by it to the credit references furnished. As soon as the contracts had been purchased, it was the custom to mail out payment books to the supposed purchasers in which were to be recorded by the plaintiff the monthly payments. Insurance certificates, receipts, etc., were also mailed out at this time to the purported purchasers. It appears that the various credit inquiries, which were generally addressed to banks, business concerns, and individuals in the vicinity of Montgomery, were sent through the United States mails and received at the Montgomery postoffice, but were seldom delivered to the persons to whom they were addressed. The evidence established that, at the request of Hunting, Malone, the postmaster, turned over to him substantially all of the mail which arrived at Montgomery in the envelopes of the plaintiff. When such mail was received by Hunting, he at times would answer the credit inquiries himself, some letters were destroyed, and the inquiries which concerned actual persons, but who were not purchasers of cars, were occasionally delivered to the addressed credit references, and such references would generally respond to the plaintiff. The insurance certificates, payment books, etc., which were mailed to the supposed purchasers were delivered to Hunting and retained by him. Not all of Hunting's contracts were made out to fictitious persons. Some were made out in the names of bona fide people, but the purported purchasers had not bought any cars from Hunting. It appears also that many of the cars listed in the contracts described automobiles with serial and motor numbers that were actually in existence, but the purchasers of said cars as listed in the conditional sales contracts were either fictitious persons, or actual persons who had not in fact purchased the cars, nor had they signed the conditional sales contracts. In the conduct of its business with the purchasers named in the various conditional sales contracts purchased from Hunting, the plaintiff used the United States mails, but, by reason of the arrangement between Hunting and the defendant Malone, the correspondence, inquiries, etc., did not reach the persons to whom the letters were addressed, but were received by Hunting instead, and in this manner he was able to dupe the plaintiff for a long period of time. In order to cover up his fraud, Hunting personally made payments to the plaintiff from time to time on the various fictitious contracts that he had sold. The evidence fairly es-

tablished that plaintiff honestly believed that the contracts were bona fide, and also believed that the replies that it received from various credit references were genuine. It believed and relied upon the integrity of the United States mails and honestly assumed that the various mail matter addressed in connection with the contracts that it had purchased was being delivered to the persons to whom such mail matter was addressed. The testimony indicated that Malone knew of Hunting's business relations with the plaintiff, but it did not directly establish that Malone was knowingly a party to the fraud. Apparently, Hunting was one of the leading citizens in Montgomery, a man of rather dominant personality, and he was able to convince Malone that it was perfectly proper for the "Midland mail" to be delivered to him. However, by reason of the diversion of the mail in the manner hereinbefore described, contrary to the Postal Laws and Regulations, Hunting was able to dispose of many thousands of dollars worth of spurious contracts to the plaintiff. The jury found that Malone's wrongdoing was the direct cause of plaintiff's loss; that Malone violated his duties as postmaster; and that, as the proximate result of such violation, the plaintiff sustained a money loss at least to the extent of the penal sum of the bond, which was the amount of the verdict.

At the close of all the testimony, the defendant surety company made a motion for an order dismissing plaintiff's case on the following grounds:

"1. That plaintiff has no right to bring this action; that this defendant is and was under no liability or obligation to plaintiff either under the official bond of the defendant Malone as Acting Postmaster at Montgomery, Minnesota, or otherwise; that the sole party in interest who may sue on or recover under said official bond is the United States of America.

"2. That plaintiff has failed to show any authority, permission or consent from the United States of America to institute or maintain this action on said official bond.

"3. That no authority, permission or consent was obtained by plaintiff from the United States of America to institute or maintain any action on said official bond.

"4. That the United States of America declined to give plaintiff authority, permission or consent to institute or maintain this action on said official bond.

"5. That the court is without jurisdiction to entertain this suit, which is one between plaintiff, a citizen and resident of the State of Minnesota, against defendant Malone, a citizen and resident of the State of Minnesota, and this defendant, a citizen and resident of the State of New York, wherein no separable controversy exists between the said defendants and plaintiff.

"6. That the court is without jurisdiction to entertain this suit in that it is not one arising under the Postal Laws of the United States of America.

"7. That the Postal Regulations of the United States of America, edition of 1932, particularly section 816 thereof, provides the sole, exclusive, and only method of recovery on the bond here involved, and that none of the matters and things required by said Regulations to be done and performed as a prerequisite to an action on said bond has been done or performed, either by plaintiff or otherwise."

It was the ruling on this motion which was deferred. The first four grounds urged by the defendant surety company in support of its motion for dismissal are the only ones that require any lengthy discussion. If plaintiff had no right to proceed against the official bond of the postmaster to recover the damages sustained, without the approval or consent of the United States, obviously the motion should be granted.

In considering the right of this plaintiff to sue on the postmaster's bond, there are certain well-recognized principles that should be considered. Where the statute provides that the obligee of an official bond shall be the United States, a third party is afforded no direct protection thereunder unless an intent to that effect can be read into the statute or statutes providing for such bond, or other statutes or regulations having bearing thereon. In absence of express language indicating such intention, the burden of proof necessarily rests upon the third party to establish his right to sue on the bond. Further, the fact that a third party has an interest in the faithful performance of the duties which the principal of the bond is required to perform, standing alone, does not establish the privity necessary to enable the third party to enforce its conditions and covenants. Washington v. Young, 10 Wheat. 406, 6 L.Ed. 352; German Alliance Ins. Co. v. Home Water

Supply Co., 226 U.S. 220, 33 S.Ct. 32, 57 L.Ed. 195, 42 L.R.A.,N.S., 1000; Howard v. United States, 184 U.S. 676, 22 S.Ct. 543, 46 L.Ed. 754.

■ If the provisions of the pertinent statutes herein indicate the faithful fulfillment of the fiscal and fiduciary relationship between the Government and postmaster to be the primary object of the bond, it would negative any intention to embrace within its coverage any loss that the public might sustain by reason of the malfeasance or carelessness of the postmaster. It must be recognized that large sums of money are handled by this official and that it is of primary importance that the Government be made secure if the breach of duty on the part of the postmaster results in loss to it. If the Government has no control over claims made against a postmaster's bond and is to be relegated to the role of an ordinary suitor without priority, its bond is of but little security. An examination of the statutes dispels any serious doubt as to the intention of Congress. It is apparent that the dominant purpose of this bond is to protect the Government. Certainly,

if there are no statutory provisions which even suggest an intent to cover private losses, such absence must be accorded great weight in determining the intendment of Congress.

The pertinent portion of section 34, tit. 39 U.S.C.A., which provides for a postmaster's bond, reads as follows:

"§ 34. *Bond.* Every postmaster, before entering upon the duties of his office, shall give bond, with good and approved security, and in such penalty as the Postmaster General shall deem sufficient, conditioned for the faithful discharge of all duties and trusts imposed on him either by law or the rules and regulations of the department."

Section 377, tit. 5 U.S.C.A., provides:

"§ 377. *Form of bonds and contracts.* All bonds taken and contracts entered into by the Post Office Department shall be made to and with the United States of America."

Other statutes, 39 U.S.C.A. §§ 35–38, 40, 44, which have a bearing upon postmasters' bonds will be found in the footnote.[1]

---

[1] "§ 35. *Approval of bonds.* The bonds of all postmasters may by the direction of the Postmaster General be approved and accepted, and the approval and acceptance signed by the First Assistant Postmaster General or by the Fourth Assistant Postmaster General in the name of the Postmaster General."

"§ 36. *New bonds; application of payments.* Whenever any postmaster is required to execute a new bond, all payments made by him after the execution of such new bond, may, if the Postmaster General or the Comptroller General deem it just, be applied first to discharge any balance which may be due from such postmaster under his old bond."

"§ 37. *Deficiency in accounts; notice to sureties.* When a deficiency shall be discovered in the accounts of any postmaster, who after the adjustment of his accounts fails, to make good such deficiency, it shall be the duty of the General Accounting Office to notify the Postmaster General of such failure, and upon receiving such notice the Postmaster General shall forthwith deposit a notice in the post office at Washington, District of Columbia, addressed to the sureties respectively upon the bonds of said postmaster, at the office where he or they may reside, if known; but a failure to give or mail such notice shall not discharge such surety or sureties upon such bond."

"§ 38. *Vacancies; appointment of successors; period of liability on bonds; temporary appointments.* Whenever the office of any postmaster becomes vacant, the Postmaster-General or the President shall supply such vacancy without delay, and the Postmaster-General shall promptly notify the General Accounting Office of the change; and every postmaster and his sureties shall be responsible under their bond for the safe-keeping of the public property of the post-office, and the due performance of the duties thereof, until the expiration of the commission, or until a successor has been duly appointed and qualified, and has taken possession of the office; except that in cases where there is a delay of sixty days in supplying a vacancy, the sureties may terminate their responsibility by giving notice, in writing, to the Postmaster-General, such termination to take effect ten days after sufficient time shall have elapsed to receive a reply from the Postmaster-General; and the Postmaster-General may, when the exigencies of the service require, place such office in charge of a special agent until the vacancy can be regularly filled; and when such special agent shall have taken charge of such post-office, the liability of the sureties of the postmaster shall cease."

"§ 40. *Release of sureties on bond.* If on the settlement of the account of any

There is no provision nor intimation in the statute that the patrons of a postoffice are to be given protection by the bond to be furnished. No assurance is given to the public that it may do business with the postal system and have recourse to the postmaster's bond. Section 36 would indicate that in the accounting the Government's loss alone was being considered in the bond protection. Further, it will be observed that in section 37 the Government makes provision for the notice that must be given by it to the sureties of any deficiency as disclosed in the accounts of any postmaster. Nothing is said about the notice that should be given in the event any patron claims loss by reason of the postmaster's neglect. Section 38 pertains to the period of liability on a postmaster's bond and prescribes the method by which the sureties may terminate their responsibility in case there is a vacancy in the office of postmaster and delay in filling it. This section would indicate that, although a postmaster's office is vacant, the sureties are not released and are responsible for the safe-keeping of the public property of the postoffice and the due performance of the duties thereof. That the primary purpose of the bond is to insure the inviolability of government property is emphasized by this section. No reference is made therein to any obligation to third parties, or the circumstances under which sureties might be absolved of responsibility to them. Section 40 prescribes a three-year statute of limitations on the sureties' liability where suit shall not have been initiated within three years after the close of an account indicating liability of a postmaster to the United States. Section 44 provides that the sureties shall forfeit and pay double the amount of the gross receipts in the event the postmaster neglects to render his accounts for one month after the time that they shall be due. Again, it may be pointed out that this provision, in prescribing an arbitrary penalty, would seem to negative any intention that anyone but the Government shall be entitled to protection. The statutes may be searched in vain for even the slightest suggestion that an intendment exists to protect the public against loss.

██ It is urged that, in that section 34 requires a bond to be conditioned for the postmaster's "faithful discharge of all duties and trusts imposed on him either by law or the rules and regulations of the department," such clause is sufficient to include the duties and trusts that a postmaster should fulfill in carrying out the obligation that he owes to the public. But, in this connection, it must be recognized that this provision does not create any scope of coverage inconsistent with the defendant surety company's position that it is limited to the named obligee. Obviously, there was no duty on the part of Congress to extend the coverage to the public. If it intended that the protection be limited to the named obligee, the quoted language from the statute would be the usual and customary covenants to be incorporated in the bond. The Court does not understand that a third party has the right to sue on an official bond merely because such right has not been specifically excluded. The burden nevertheless rests upon the plaintiff to establish that such right is expressly given or necessarily implied.

Plaintiff relies upon Howard v. United States, supra, 184 U.S. 676, 22 S.Ct. 543, 46 L.Ed. 754, but the distinction between the facts of that case and the instant situation is reasonably clear. The statute governing clerks of United States courts, which office was being considered by the court, required the clerk to give a bond to the United States conditioned "faithfully to discharge the duties of his office, and seasonably to record the decrees, judgments, and determinations of the court." 28 U.S. C.A. § 513. The decrees, judgments, etc., obviously referred to proceedings in private cases, as well as the entry of these orders in litigation instituted by the Government. Congress evidently intended that a clerk's failure timely to enter or satisfy judgments in behalf of private suitors, for

---

postmaster it shall appear that he is indebted to the United States, and suit therefor shall not be instituted within three years after the close of such account, the sureties on his bond shall not be liable for such indebtedness."

"§ 44. *Neglect to render accounts.* Whenever any postmaster neglects to render his accounts for one month after the time, and in the form and manner prescribed by law and the regulations of the Postmaster General, he and his sureties shall forfeit and pay double the amount of the gross receipts at such office during any previous or subsequent equal period of time; and if, at the time of trial, no account has been rendered, they shall be liable to a penalty of such sum as the court and jury shall estimate to be equivalent thereto, to be recovered in an action on the bond."

instance, would constitute a breach of the bond. The dominant purpose of the statute was not to protect the Government alone. Private litigants stood on an equal footing with the Government. There is no provision in any of the statutes pertaining to a postmaster's bond which conditions the bond upon the postmaster's performance of any specified or direct duty to the public. The court placed particular emphasis upon the language of the statute providing for the bond that should be given by the clerk, and it is clear that it determined that, by reason of this language, Congress intended to afford coverage to the public where it had been damnified by the clerk's breach of duty. In discussing the liability of the clerk's bondsmen to private litigants, the court stated (page 687, 22 S. Ct. page 548):

"But it is said that, the bond in suit having been given to the United States, it must be deemed an instrument for the sole benefit of the government, and therefore no suit can be maintained on it for the benefit of an individual suitor, although such suitor may have been damaged by the failure of the clerk to discharge his duty. This results, it is supposed, from the fact that there is no statute expressly authorizing such a suit. If this position be well taken, it would follow that the bonds required to be given by clerks of the Federal courts are not in any case for the protection of private suitors. We are of opinion that Congress never intended that any such condition of things should exist, but intended that the bond of a clerk should be for the protection of all suitors, public and private, and to that end authorized his bond to be increased to $40,000. It is impossible to suppose that, when requiring a clerk to give bond to the United States 'faithfully to discharge the duties of his office, and seasonably to record the decrees, judgments, and determinations of the court,' Congress had in mind the interests of the United States alone, and purposely refrained from making any provision whatever for the security of private suitors in the Federal courts. Such a conclusion would be inconsistent with the practice of a century, and would greatly surprise the profession. As may well have been anticipated when those courts were first established, the great mass of litigation in the district and circuit courts of the United States has always been between individuals, and consequently the words above quoted, it must be assumed, had reference to individual suitors as well as to the United States. In our opinion, the bond of the clerk is for the benefit of every suitor injured by the failure of that officer faithfully to discharge his duties or seasonably to record the decrees, judgments, and determinations of the court. It must have been so understood when the courts of the United States were established and provision made for the appointment of clerks who should be entitled to receive the moneys of suitors when paid into court under its sanction or pursuant to any statute."

That there were more private than public litigants doing business with the office of clerk of court was especially true when the statute referred to in the Howard Case was adopted. Private litigants directly depend upon the clerk of court faithfully to discharge the duties of his office. He owes a direct duty under the statute to private litigants. Large sums of money belonging to private suitors are often paid to the clerk. Such moneys are not paid to the Government as such. Private suitors rely upon the clerk "seasonably to record the decrees, judgments, and determinations of the court." The use of this language must imply an intention on the part of Congress to permit a private claimant, who has been damaged by the clerk's malfeasance, direct recourse against the bond.

There is no showing in the Howard Case that Congress had by statutory enactments provided exclusive ways and means for the Government to proceed against the sureties, or that there were statutes arbitrarily fixing the liability of the sureties to the Government, or that the protection of Government property was the principal purpose of the bond. In that case, the statutory provisions and all the circumstances unmistakably indicated an intention to provide coverage for the private suitor as well as the Government, while in the instant case, every pertinent statute and circumstance, if not to the contrary, at least do not directly support the theory of coverage. The clerk's bond is approved by the court. He is appointed by the court and occupies a direct fiduciary relation to the public and to the Government. The bond of a postmaster is approved by the Postmaster General. Postmasters of the first, second and third classes are appointed by the President, with the advice and consent of the Senate. Elaborate provisions have

been promulgated by the Postoffice Department regarding surety companies, which are authorized to write bonds, the limitation on the penal sum of the bond in relation to the paid-up capital and surplus of the surety, and the status and qualifications of surety companies. (Sections 69 to 72, inclusive, Postal Laws and Regulations).

It is evident that, by the adoption of various rules and regulations, the Government has endeavored to protect the public against the usual and normal losses that may occur on account of carelessness in the handling of the mails or otherwise. The payment of money to a postmaster on postal savings, for instance, constitutes a direct obligation on the part of the Government to the patron. Provisions are made for registering and insuring mail matter. In Act June 16, 1921, § 4, as amended by Act June 22, 1934, 5 U.S.C.A. § 392, the Government has outlined a summary method of settling claims arising by reason of the negligence and misconduct of the postmaster, where the same may be settled for less than $500.00. In 31 U.S.C.A. § 215, and also found in section 59 (2) of the Postal Laws and Regulations, the head of the department is authorized to adjust and determine any claim on account of damages to, or loss of privately owned property where the amount of the claim does not exceed $1,000.00, caused by the negligence of any officer or employee of the Government acting within the scope of his employment. The Postal Laws and Regulations under section 59 (2) have promulgated detailed rules covering claims for such damages. Section 790, tit. 39 U.S.C.A., and Postal Laws and Regulations No. 233 provide means whereby the postal department may distribute moneys that have been recovered through administrative action in instances where such moneys have been stolen from the United States mails. Section 816 of the Postal Laws and Regulations provides for suits by the United States and the distribution by appropriate administrative officers of the Postoffice Department among persons damaged "by loss, rifling, damage, wrongful delivery of, or depredations upon registered or other mail, and the failure to collect or remit C. O. D. funds."

While it is true that the Government may proceed to recover on a postmaster's bond for the total loss incurred and has a moral obligation to disburse the proceeds to the parties who may have sustained the loss (U. S. Fidelity & Guaranty Co. v. United States, 9 Cir., 246 F. 433; United States v. U. S. Fidelity & Guaranty Co., 6 Cir., 247 F. 16), the right of the Government to sue on a clerk of court's bond for the benefit of the public has also been sustained in United States v. Abeel, 5 Cir., 174 F. 12. However, the moral obligation of the Government to protect the patrons of the postoffice who may have suffered loss, whenever it may proceed against an available fund, is entirely consistent with the apparent purpose of the statutes in question. It is the Government that must institute the proceedings. If a surplus remains after the Government has been made whole, the public has the right to expect an equitable distribution of the balance. The present suit, being instituted by a private person without the consent of the Government, would exhaust the entire bond, and such a situation cannot be reconciled with the primary purpose of the statute, which is to provide means whereby the losses of the Government will be first indemnified. Certainly, such circumstances have a bearing upon the ultimate interpretation which should be made with reference to the intent of Congress. With the protection afforded to the public in its dealings with postmasters, it is reasonable to assume that Congress intended that direct recourse against the bond be limited to suits by the named obligee. If the recovery requires a distribution to private claimants, it is to be assumed that the obligee will fairly and equitably perform that duty.

It may be urged that the various administrative remedies afforded to patrons who may have sustained losses are not necessarily exclusive but are merely cumulative to the right of a private claimant to proceed against the bond. However, that argument might be persuasive if there existed any apparent intention manifested by Congress to provide direct bond protection for private patrons. The regulations. and administrative remedies become significant, however, because they tend to support the position that, not only has the Postoffice Department, as well as Congress, assumed that no direct remedy was afforded a private citizen under a postmaster's bond, at least without the obligee's consent, but it would appear that such remedies negative the implied intention which is the basis of this suit.

418

Plaintiff cites and emphasizes the case of United States ex rel. Brimberg Bros. v. Globe Indemnity Co., 2 Cir., 26 F.2d 191. However, in that case not only did the Attorney General of the United States authorize the suit, but Congress had authorized the Secretary of the Treasury to provide security for the owners of merchandise hauled by carriers from the wharves of the City of New York to the appraisers' stores. The transportation of this merchandise arose by reason of custom duties imposed by the Government. The Secretary of the Treasury did promulgate a regulation as required by the statute, but neglected to indicate whether the bond to be provided by the carrier should secure the merchandise as well as the revenue in which the Government was solely interested. It appeared that the owner of the merchandise sustained a loss by reason of the carelessness of the carrier, who had furnished a bond under the statute. In that a bond was required by the regulation, the court implied from all the circumstances that the Government intended to provide protection by way of the bond furnished for the owners of the merchandise, as well as the revenue. The court was of the opinion that the facts warranted an implied intent to afford the owners of the merchandise redress against the bond. In view of the facts of this case, it is not an authority for plaintiff's theory of recovery in the instant situation.

The plaintiff cites many other cases, but they are not particularly helpful, and do not depart from the principle that the intendment of coverage must be either express or implied. The few reported cases which have dealt with suits on a postmaster's bond have held that a mail user may not maintain an action thereon.

In Idaho Gold Reduction Co. et al. v. Croghan et al., 6 Idaho 471, 56 P. 164, the Supreme Court of Idaho, in sustaining a demurrer to plaintiff's complaint, stated (56 P. page 164):

"We know of no law authorizing the bringing of suit upon a postmaster's bond by a private party. It could only be done by virtue of some statute of the United States, and we know of no such statute."

In Wile v. United States Fidelity & Guaranty Co. et al., 1918, 6 Alaska 48, a postmaster, who had paid a loss to the Government occasioned by the embezzlement of an assistant postmaster, sued on the bond of the assistant postmaster to recover the amount paid. The pertinent statement of the court is as follows (page 49):

"I cannot see that any cause of action is stated in favor of Wile against the Surety Company. There is no privity of contract between them. The bond runs to the United States of America, and by its terms is to protect the government."

In United States v. Griswold, 1904, 8 Ariz. 453, 76 P. 596, the court was considering the right of the United States to recover the entire loss sustained by the negligence of a postmaster, regardless of its limit of liability to the patrons who sustained the loss. In upholding the right of the United States to sue for the entire loss, the court made the following observation as to the right of a third party to proceed against the bond (76 P. page 597):

"At common law suit upon an official bond must be brought and a recovery had in the name of the obligee. There is no congressional statute modifying the common-law limiting the liability of sureties to suits brought by or in the name of the United States, as there is in the case of bonds given by United States marshals. In the latter case there is statutory authority authorizing any person to bring, in his own name and for his sole use, suit on the marshal's bond for a breach of its conditions. Section 784, Rev.St.U.S. (U.S.Comp.St. 1901, p. 607 [28 U.S.C.A. § 500]). It follows, therefore, that P. Sandoval & Co. could not maintain a suit on the postmaster's bond in their own name to recover for the loss of the registered package.

"* * * To hold that the United States may not maintain an action upon the bond of the postmaster for the recovery of the entire loss sustained by the negligence of the postmaster because it was not obligated to return or make good to P. Sandoval & Co. an amount exceeding $10, would be to deny to the latter any redress unless the postmaster be personally responsible to the extent of such loss."

In 49 C.J. 1145, § 56 (citing Idaho Gold Reduction Co. et al. v. Croghan et al., supra, and United States v. Griswold, supra) it is said:

"But it is well settled that, in the absence of special statutory authorization, a private person cannot sue on a postmaster's official bond for moneys coming into his hands in his official capacity and lost through his negligence or default."

The following cases also tend to support the conclusion reached herein: Robins Dry Dock & Repair Co. v. Flint et al., 275 U.S. 303, 48 S.Ct. 134, 72 L.Ed. 290; Fosmire v. National Surety Co., 229 N.Y. 44, 127 N. E. 472; Clark v. United States, 60 Ga. 156.

■■ The Government has refused to give its consent to the bringing of this suit. The only indication that the Court has received as to the Government's position in the matter is a brief filed during the trial by the United States Attorney of this district as amicus curiæ in support of the defendant surety company's position that the plaintiff has no right to bring this action on this bond. The plain intendment of the statute being to provide coverage for the Government alone, it is clear that the bringing of this suit without the consent of the Government forecasts serious complications and threatens to destroy that which the Government has provided for its own protection. It is no answer to say that the present suit will not jeopardize the Government because the present bond has been supplanted by a new bond obtained when Malone was elevated from Acting Postmaster to Postmaster. If a private citizen has the right to sue, the entire security provided by the bond may soon be exhausted by numerous private suits. The fact that there is an utter absence of any statutes, rules or regulations whereby the paramount right of the Government may be safeguarded, tends to substantiate the defendant surety company's position that Congress did not intend that suits of this nature could be brought without the consent of the United States. In the Howard Case, consent of the United States was not given, but it was reasonably clear, in view of all the circumstances, that Congress did intend to provide direct protection for the public in dealing with clerks of court. Where Congress apparently had intended to provide protection under the bond for private litigants, the court in that case was not particularly concerned with the conflicting interests that might arise between the Government and the public; that is, the failure of Congress to provide suitable machinery to protect equitably all claimants against the clerk of court's bond should not militate against the right of redress that was clearly intended for private suitors. But, in absence of such expression by Congress, the adoption of plaintiff's theory herein would subject the protection intended for the Government to a multitude of suits, which was never in the contemplation of the parties.

In Washington v. Young, supra, 10 Wheat. 406, 6 L.Ed. 352, it appears that the City of Washington was conducting a lottery and had employed a manager who had given a bond to the city. Without its consent, suit was instituted in the name of the city for the benefit of a purchaser of a lottery ticket on the ground of an alleged breach of the bond by the manager of the lottery. In the opinion rendered by the court, Chief Justice Marshall stated (page 407):

"The first inquiry is, into the right of the proprietors of the ticket No. 1037, to sue in the name of the corporation, without its consent. Their counsel insists, that the bond was taken for the benefit of the fortunate adventurers in the lottery, and that each has a right to use it. * * * They have undoubtedly 'a right to apply to the corporation to direct the suit, and the corporation could not, consistently with their duty, have refused such application,' if the purpose of the bond was to secure the fortunate adventurers in the lottery, not to protect the corporation itself. But the propriety of bringing such suit was a subject on which the obligees had themselves a right to judge. If the proprietors of one prize-ticket had an interest in this bond, the proprietors of every other prize-ticket had the same interest; and it could not be in the power of the first bold adventurer who should seize and sue upon it, to appropriate it to his own use, and to force the obligees to appear in court as plaintiffs, against their own will. No person who is not the proprietor of an obligation, can have a legal right to put it in suit, unless such right be given by the legislature; and no person can be authorized to use the name of another, without his assent given in fact, or by legal intendment. * * * We think, then, that this case is no authority for the power claimed by the proprietors of ticket No. 1037; and we think, upon general principles, they had no right to institute this suit without the consent of the corporation. * * * The proprietors of the ticket No. 1037 have shown no right to sue on this bond. * * * But if they have, without authority, put this bond in suit, the proper course is to turn them out of court, not to render a judgment, which may bar any future suit brought by the plaintiffs, whose names have been improperly used."

420

In Howard v. United States, supra, 184 U.S. 676, 691, 22 S.Ct. 543, 550, the court discussed the case of Washington v. Young and stated:

"That case undoubtedly is authority for the proposition that, generally speaking, an obligation taken under legislative sanction cannot, in the absence of a statute so providing, be put in suit in the name of the obligee, the proprietor of the obligation, without his consent."

▮▮▮▮▮ A fair analysis of the entire situation presented herein requires a finding that the legal intendment, which was found in the Howard Case, does not exist and cannot be found in the instant proceeding. The Howard Case must be limited to its particular facts. The "peculiar relation" of the clerk to the courts, as well as to the public, does not have its counterpart in the case at bar. That case does not hold that anyone injured by the conduct of an employee of the Government has the right to sue on an official bond where the United States is named as the sole obligee. It clearly upholds the principles enunciated in Washington v. Young, supra, and German Alliance Ins. Co. v. Homewater Supply Co., supra, that an absence of legislative intent to clothe an unnamed obligee with authority to proceed against the surety is fatal to an action on the bond instituted by him. The interest that every citizen may have at times in the faithful performance of the duties of a public employee, or the fact that damage results to him from a failure of such employee to fulfill carefully his duties, does not create the right. No third party has the right to obtain the advantage of any contract, official or otherwise, to which he is not a party, unless it can be shown that it was intended for his direct benefit.

It is highly significant that generally when it is the intention of Congress to permit private suits on bonds where the United States is named as obligee, express provision is found in the statute. Such provision will be found in the case of a bond to be furnished by a United States marshal, consular officer, or contractor performing public work for the Government. That Congress did not, under all the circumstances, intend that private parties should maintain a suit on this bond seems indisputable.

The Court is of the opinion that, if the right to sue on the bond existed, it would have jurisdiction, but a further discussion of the other grounds presented in the motion becomes unnecessary in view of the conclusions indicated. It is therefore ordered that the defendant surety company's motion to dismiss plaintiff's cause of action on its merits be and the same hereby is granted. An exception is allowed to the plaintiff.