UNITED STATES OF AMERICA, on the Relation of LEMUEL S. MATTHEWS, Respondent, *v.* MASSACHUSETTS BONDING AND INSURANCE COMPANY and Another, Appellants.

Second Department, January 4, 1924.

Bonds — action to recover for watches lost while being carried by government contractor from pier to appraisers' stores — action is on bond given by contractor to United States — provision in bond did not exclude shipper from benefits — shipper has right to recover under bond — case containing watches was received in good condition — presumption is that good condition continued until contrary is shown — burden is on defendant to explain loss of watches while in its possession — jury not misled by charge as to theft of watches prior to delivery to contractor.

A provision in a bond given by a contractor to the United States government to secure the faithful performance of a contract for the cartage of packages, subject to custom duties, from the dock to the appraisers' stores, that no member of or delegate to Congress or officer or employee of the customs or other person whose name is not disclosed in the agreement shall be admitted to any share or part of the contract or any benefit to arise therefrom, does not exclude a shipper, who has suffered a loss through the negligence or wrong of the contractor, from recovering the loss sustained. This construction is made clear by another clause in the contract which makes the contractor responsible for all loss, injury or damage to merchandise while under his care or custody.

Where watches shipped from France to New York were lost from the case in which they were shipped while the case was in the possession of the contractor who car-

ried it from the dock to the appraisers' stores, the assignee of the shipper may maintain an action on the bond given by the defendant as security for the faithful performance by the contractor of its duties, since the bond in question was not given for the sole use of the United States but was for and inured to the benefit of the shipper whose goods were lost by the wrong or neglect of the government cartman whose control over them was to enable their delivery to the government for the purpose only of having their dutiable value appraised and the duties collected.

The case containing the watches having been in good condition when delivered to the steamship company for shipment, it may be presumed that it continued in that condition until the contrary is shown and that it was in good condition when received by the contractor.

It was incumbent upon the defendant to show that the loss of the goods while in the contractor's possession was not due to any fault on its part and this is so whether the contractor be regarded as a common carrier or as a bailee.

The charge by the court in reference to the effect of a theft of the watches prior to delivery to the contractor did not mislead the jury into believing that if the theft occurred before the package was delivered to the contractor the defendants could be held liable.

APPEAL by the defendants, Massachusetts Bonding and Insurance Company and another, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of Queens on the 13th day of January, 1923, upon the verdict of a jury, and also from an order entered in said clerk's office on the 24th day of January, 1923, denying the defendants' motion for a new trial made upon the minutes.

*Nathan Frankel,* for the appellants.

*Neil P. Cullom* [*William E. Collins* with him on the brief], for the respondent.

KAPPER, J.:

The action is brought to recover for the loss of a case of fine watches shipped from France to New York. The claim was assigned to Lemuel S. Matthews, whose name appears in the title as the relator. It is asserted that the appellant P. H. Keahon, Inc., caused or suffered the loss and that it and the appellant bonding company should respond to plaintiff therefor. P. H. Keahon, Inc., was under contract with the United States government to cart all packages and articles imported into the United States and landed at the port of New York, from the ships to the appraisers' warehouse in the city of New York, for fixed charges to be paid by the government to said P. H. Keahon, Inc. The contract exacted a bond " in the penal sum of fifty (50) thousand dollars," conditioned for its " faithful performance." Such a bond was given by the appellant, Massachusetts Bonding Company, obligating it, as follows:

" Now, if the said P. H. Keahon, Incorporated, shall well and

truly fulfill all the covenants and conditions of said contract, and shall perform all the undertakings therein stipulated by it to be performed, then this obligation to be void; otherwise to remain in full force and effect."

It was shown that the watches were put in a sealed package in Paris and so delivered by the packer personally to the purser of the steamship *Leopoldina* at Havre which later docked at the foot of Thirty-first street, Brooklyn, at the Fabre Line pier on June 16, 1920. The system at the dock called for an examination of packages as to their condition. This particular package was discharged from the steamer in perfect condition, with the seals intact, and was placed in a " crib " or inclosure made of cast iron or wire netting and kept under lock and key until turned over to the Keahon Company's driver, who signed for it as received by him " in good order." When the package came into the hands of the government clerks at the appraisers' stores a receipt was given on behalf of the government to the driver stating, as to this particular package, " seal broken," " dumped up " and " in bad order." The package on being opened by the government opener at the appraisers' stores showed " the tin lining torn," the cartons containing only " rocks," and the entire contents of valuables missing. The plaintiff's claim is that this package was delivered to P. H. Keahon, Inc., in good order with contents unaffected, and that at some time during its transportation from the Fabre Line pier to its arrival at the appraisers' stores some thief or thieves rifled the package of its contents. For the loss so incurred the suit is brought in the name of the United States on the relation of the said assignee.

The principal question argued by the appellants is that " The respondent Matthews had no cause of action against the appellants on the bond;" and they contend that under the provisions of the contract between P. H. Keahon, Inc., and the United States " (a) the truckman under the contract was responsible *only to the United States Government* for loss of merchandise, (b) the bond required to be furnished was *to and did run only to the United States Government,* (c) the United States Government alone was responsible for the payment of this cartage and the truckman could not look for recompense to the importer for such drayage, and (d) the contract specifically by its terms contained a stricture against any one being deemed to have power or part under the agreement or any benefit to arise therefrom, except the parties to the agreement."

The parties do not differ on the practice obtaining and required by the customs regulations regarding the disposition of goods and merchandise received at the port of New York. There is no doubt that neither the exporter nor importer has any control over the

articles until after the examination at the appraisers' stores and the payment of the customs' duties fixed. The entire control and regulation is by the government, but the cartage from the ship or pier to the appraisers' stores is under the management and control of the cartage contractor, in this case the Keahon corporation, pursuant to statute and customs regulations* which call for a letting of such public cartage contract to the lowest responsible bidder upon a bond being given in a sum to be fixed by the Secretary of the Treasury for the faithful performance of such contract.

The contract between the Keahon corporation as party of the first part, and the United States acting through Carter Glass, Secretary of the Treasury, made June 10, 1919, for the period of one year from July 1, 1919, provides " that said party of the first part shall be responsible to said party of the second part for all loss, injury, or damage to merchandise, whether by theft, accident, or otherwise, while under the care or custody of the said party of the first part for carriage as aforesaid." There is also the following provision in the contract: "And it is further mutually covenanted between the parties hereto, that it is an express condition of this contract that no Member of or Delegate to Congress, or Resident Commissioner, or officer or employee of the customs or other person whose name is not disclosed in this agreement, shall be admitted to any share or part of this contract or any benefit to arise therefrom, and that this contract shall not be assigned, sublet, pledged or hypothecated without the written authority of the Secretary of the Treasury, and that any assignment, subletting, pledge, or hypothecation without such authority shall be a forfeiture of the same."

Do the words in the last preceding quotation, " or other person whose name is not disclosed in this agreement, shall be admitted to any share or part of this contract or any benefit to arise therefrom," import an exclusion of a shipper who has suffered a loss through the negligence or wrong of the drayman to whom the contract has been let? This clause, in my opinion, was inserted in the contract agreeable to the United States Criminal Code which contains an inhibition against Congressmen or Resident Commissioners (in the District of Columbia), and " officers or agents " of the United States from being interested directly or indirectly in any contract to which the United States is a party. (U. S. Crim. Code [35 U. S. Stat. at Large, 1108], § 112; U. S. Comp. Stat. 1918, § 10282; Barnes' Fed. Code 1919, § 9809.) I do not think the words in the contract " or any benefit to arise there-

---

* See Customs-Revenue Act of 1874 (18 U. S. Stat. at Large, 191), § 25; U. S. Customs Regulations of 1915, art. 824.— [REP.

from " were intended as of greater potency than that these public officers should not be admitted to share in such a contract or its benefits. It seems to me inconceivable that the government not alone would deprive shippers and importers of all control over their merchandise, but also and at the same time deny them protection against a loss of such property while in the hands and under the control of the government through its contractee, the public drayman. And this seems clearly to me to be evidenced by the clause in the contract which makes the cartage contractor responsible " for all loss, injury, or damage to merchandise, whether by theft, accident, or otherwise, while under the care or custody of the said party of the first part [the cartage contractor] for carriage as aforesaid."

True, the clause quoted makes the drayman responsible for loss so occasioned " to said party of the second part," namely, the government, but that, in my opinion, is not so far controlling as to exclude the shipper from bringing suit.

The appellants rely upon the case of *Fosmire* v. *National Surety Co.* (229 N. Y. 44). The syllabus in that case fairly states the proposition there involved:

" Where a surety company furnished for a State highway contractor a bond to the People of the State, guaranteeing full performance of the contract, and also, among other things, that the contractor would pay, or cause to be paid, in full the wages stipulated and agreed to be paid to each and every laborer employed by the contractor or by his agents, and the contractor failed to pay a laborer, this provision of the bond does not give such laborer a right of action against the surety for the wages due to him. The bond is inconsistent with an intention that the plaintiff should have a right to sue upon it. The cause of action is in favor of the People solely. The dominant purpose of the bond was protection to the State, and the State did not intend to make the employees of its contractors the beneficiaries of a cause of action to be enforced in hostility to its own, or that the security should be exhausted at the instance and for the benefit of persons other than the State itself."

The only possible loss that could be occasioned to the United States government which the appellants point out is that, in the event of the cartman breaching the contract or refusing or being unable to continue with the same, " the government would be compelled to let this contract out to others at undoubtedly higher rates than the cartman charged under the contract." I do not regard this remote danger to the government of the cartman falling down on his contract as the " dominant purpose " of the bond. In my opinion, the " dominant purpose " of the bond here was

protection to the shipper or importer against loss " by theft, accident, or otherwise, while under the care or custody " of the cartage contractor " for carriage."

In *Howard* v. *United States* (184 U. S. 676) it appears that one Stewart sued the county of Henry in the State of Missouri. On March 3, 1891, the defendant in that suit, the county of Henry, in satisfaction of the cause of action deposited the sum of $2,525 with one Watson, the clerk of the court, who on that day deposited the same in a bank to his individual credit and who later died without accounting for said sum to Stewart or to the said county of Henry. Watson had theretofore given the usual bond of clerks of Federal courts prescribed by the United States Revised Statutes (§ 795) and section 3 of the Federal Act of February 22, 1875 (18 U. S. Stat. at Large, 333) for the faithful discharge of the duties of his office. Stewart sued the sureties on this bond " in the name of the United States, at the relation and to the use of David D. Stewart." (See opinion on page 680.) Mr. Justice HARLAN (p. 680) said: " The Government is the nominal, while Stewart is the real, plaintiff." And, further (p. 687): " But it is said that the bond in suit having been given to the United States, it must be deemed an instrument for the sole benefit of the Government, and therefore no suit can be maintained on it for the benefit of an individual suitor, although such suitor may have been damaged by the failure of the clerk to discharge his duty. This results, it is supposed, from the fact that there is no statute expressly authorizing such a suit. If this position be well taken, it would follow that the bonds required to be given by clerks of the Federal courts are not in any case for the protection of private suitors. We are of opinion that Congress never intended that any such condition of things should exist, but intended that the bond of a clerk should be for the protection of all suitors, public and private, and to that end authorized his bond to be increased to forty thousand dollars. It is impossible to suppose that, when requiring a clerk to give bond to the United States ' faithfully to discharge the duties of his office, and seasonably to record the decrees, judgments and determinations of the court,' Congress had in mind the interests of the United States alone, and purposely refrained from making any provision whatever for the security of private suitors in the Federal courts. Such a conclusion would be inconsistent with the practice of a century, and would greatly surprise the profession. * * * In our opinion, the bond of the clerk is for the benefit of every suitor injured by the failure of that officer faithfully to discharge his duties or seasonably to record the decrees, judgments and determinations of the court. It must have been so understood when the courts of the United States were established and provision

made for the appointment of clerks who should be entitled to receive the moneys of suitors when paid into court under its sanction or pursuant to any statute."

Of course, the United States could not be sued for this loss, except in so far as provision for such a proceeding was provided by the jurisdiction conferred by Congress upon the Court of Claims. (*Schillinger* v. *United States*, 155 U. S. 163, 166.) But it seems to be well-accepted practice to permit what is known as the usee of a fund paid into court or a person injured by the act of a principal who is bonded, to sue in the name of the government *on the relation* or *to the use of* such a person where bonds are given to such government for the faithful discharge of obligations entered into with them. For instance, in *United States* v. *Abeel* (174 Fed. Rep. 12), where the case of *Howard* v. *United States* (*supra*) was approvingly cited, the United States brought suit in its own name on the bond of a court clerk for certain defalcations. SHELBY, Circuit Judge (pp. 17, 18), said: " It is not denied that if the fund so received had been the property of the United States, due to the government primarily and not to others, this action could be maintained; nor is it denied that any one of the officers or witnesses who earned and to whom was due a part of such sum could maintain an action on the bond in the name of the United States for his use for the sum so due him."

It is further argued by the appellants that the shipper's right to sue must be under some express statute as in *Alexander* v. *Union Surety & Guaranty Co.* (89 App. Div. 3), where plaintiff in his own name was denied the right to sue on a bond in bankruptcy proceedings, subdivision h of section 50 of the Bankruptcy Act (30 U. S. Stat. at Large, 558) providing that such bonds " may be sued upon in the name of the United States for the use of any person injured by a breach of their conditions; " and in *United States Fidelity Co.* v. *Kenyon* (204 U. S. 349), where there was a statute authorizing suit; or, if not under express statute, that it must appear that the bond was not given for the *sole* use of the United States. Such, we think, was the purport of the bond here; it was not for the *sole* use of the United States, but was for and inured to the benefit of the shipper whose goods were lost by the wrong or neglect of the government cartman whose control over them was to enable their delivery to the government for the purpose only of having their dutiable value appraised and the duties collected. Apart from that specific purpose the government had no interest in the goods whatever.

The appellants further urge that the contents of the case of

**40**

watches at the time of delivery to the Keahon corporation were
not proven, and that there was no " presumption of continuity
of contents." The learned trial justice charged that if the proof
showed that these goods " were in good order when packed and
shipped from France, until the contrary is shown they must be
presumed to have continued in that condition," and that " The
general rule is that things once proved to have existed in a particu-
lar state are to be presumed to have continued in that state until the
contrary is established by evidence, either direct or presumptive."
This was the language of JOHNSON, J., in *Smith* v. *New York
Central R. R. Co.* (43 Barb. 225, 228; affd., 41 N. Y. 620), where it
was applied to the case of a connecting carrier. The trial court
at bar also charged that the Keahon corporation was not a common
carrier; but that plaintiff would be entitled to recover if " the
goods were lost, stolen or destroyed from whatever cause while in
the possession of the defendant Keahon." To the charge upon
the proposition of presumption of continuity there was no exception.
Every reason, however, making it incumbent upon a connecting
carrier or a common carrier to explain a loss under facts and cir-
cumstances establishing that a shipment was in proper condition
when the initial carrier received it applies to the Keahon corpora-
tion here.

The Keahon corporation was liable if the goods were lost while
in its possession, unless an explanation were given by it which
satisfied the jury that such loss was without its fault. And this
is so whether we regard that company either as a common carrier
or as a bailee. True, as a common carrier it would be an insurer.
As a bailee it would be liable only for negligence, but when loss is
proved to have occurred while property is in the hands of a bailee
a *prima facie* case is made out and any explanation which the bailee
may make to account for the loss usually presents a question of
fact.

The theory of the defense was that while these goods were on the
pier and in the cage or crib referred to, one Lewis, in the employ
of a detective agency patrolling said pier, broke into the package
and stole the contents. The evidence supporting this theory was
slight; it was given by two persons, husband and wife, by the name
of Harrison, each of whom testified to the giving of a watch to each
of them by Lewis. On this point the learned trial justice charged:
" If from the testimony they have overcome the presumption against
them, or if you should find that the property was looted from this
package before it came into the hands of Coffey [Keahon's driver],
or that it was looted from this package after it left the hands of
Coffey when he left it at the receiving stoop on the night of the

twenty-third, then the case against the defendants would fall, for in that event the defendants would have overcome the presumption against them as to the package being lost or stolen while it was in their custody and control. In other words, if after considering all the evidence in this case you find that there isn't a preponderance satisfying you that the plaintiff has established his case, that this package was delivered in good order to Keahon, through its employee Coffey, and that it was delivered in bad order, then the plaintiff's case would fall. * * * If you find that the goods were lost, stolen or destroyed from whatever cause while in the possession of the defendant Keahon, you must find a verdict for the plaintiff." No criticism is made of this charge and, indeed, it seems to me correct in the absence of something from the Keahon corporation indicating that a theft of the goods while in their control and in transit by them occurred during which time they exercised reasonable care, or care of a character that would exculpate them. But the Keahon corporation stood its ground and sought to have the inference drawn that Lewis purloined the articles while they were on the pier of the Fabre Line. If the goods came into the hands of the Keahon corporation, then it is obvious that there was a *total* default in delivering or accounting for the goods, and in such a case the *onus* of accounting for the default was on that company as bailee. (*Claflin* v. *Meyer*, 75 N. Y. 260, 263.)

Reading the entire charge, I think the jury could not have understood the court to mean that if Lewis stole the watches before the case or package was delivered to Coffey, the defendants could be held liable. The tenor and effect of the charge was, that to hold the defendants it was incumbent upon the plaintiffs to establish that this package was delivered intact to Coffey and by him delivered to the appraisers' stores broken and rifled.

The evidence justified the conclusion that the package in question with its valuable contents intact, came into the hands of P. H. Keahon, Inc., for delivery to the government for fixation of duties, and that such contents were made away with while the package was in charge of said defendant's own driver.

We have examined the remaining questions raised by the appellants and think them without merit.

The judgment and order should be affirmed, with costs.

Present — KELLY, P. J., RICH, MANNING, KELBY and KAPPER, JJ.

Judgment and order unanimously affirmed, with costs.