QUESTION: May a state agency require an employee to reimburse it for cash shortages occurring in the employee's job functions or accounts attributable to error or negligence on the part of the employee?
SUMMARY: Revolving or petty cash funds within the purview of ss. 18.101 and 216.271, F.S., are established outside the State Treasury upon proper request of a state agency, department, or official and upon approval as provided therein. Disbursements from such a revolving or petty cash fund would then be made by the state agency, official, or department requesting the establishment of same. The Comptroller's preaudit function would be performed at the time the revolving or petty cash fund was reimbursed upon proper vouchers being presented by the state agency, department, or official which had requested that the revolving or petty cash fund be established. Section 216.271(3) and (4) requires the state agency, department, or official requesting the establishment of the revolving or petty cash fund to properly maintain and account for the amounts of moneys in the fund and to return the amount originally established to the appropriate fund upon termination. This duty makes such state agency, department, or officer the insurer of such funds under Florida case law unless such funds have been deposited in a designated public depository bank. Federal law and federal regulations through which food stamp programs are established impose liability on the state agency where gross negligence or fraud on the part of the agency exists in the certification of households or the issuance of coupons. Federal regulations impose liability on the state agency for loss of coupons distributed to the state agency and for the loss of sums required to be collected by it in payment of the "purchase requirement." Such loss includes but is not limited to coupons or funds lost as a result of theft, embezzlement, or unexplained causes and requires the state agency on demand by the Food and Nutrition Service of the United States Department of Agriculture to pay to the Food and Nutrition Service the face amount of any such coupons and the amount of such cash equivalent. Federal regulations require that every official or employee responsible for receiving or issuing coupons or accepting cash or other receipts be covered by an appropriate form of surety bond in favor of the state agency in an amount adequate to protect the financial interests of the state agency in case of loss. There is no statute which authorizes the state agency to deduct from an employee's salary, retirement contributions or retirement benefits amounts sufficient to pay for losses attributable to error or negligence occurring while that official or employee was handling coupons and receiving funds for purchase requirements. There is no statute which authorizes the state agency to require the employee to reimburse the agency for a cash shortage that can be attributed to error or negligence on the part of the official or employee. STATEMENT OF FACTS: As you know, our food stamp program utilizes the Clerk III classification to receive cash and issue food stamps to qualified recipients. At the end of each day, the food stamp "cashier" and the food stamp unit supervisor go through a reconciliation process to hopefully balance the day's transactions. Occasionally, either through error or negligence, a food stamp shortage or cash shortage/overage will exist. You do not specifically state the source of the missing moneys, but it would appear that the moneys would have either resulted from your having established a revolving or petty cash fund within the purview of ss. 18.101 and 216.271, F.S., outside the State Treasury, which funds are being utilized by the Clerk III's in the performance of their duties in the food stamp operation, or it is moneys received by the clerks from recipients for the purchase of food stamps in the daily operation of the food stamp office. Thus, when cash shortages occur as described above, it is either a shortage in the revolving or petty cash fund, or a shortage in cash received for the purchase of food stamps. A discussion of the revolving or petty cash fund is in order first. Generally, all state funds are required to be reposed in the State Treasury to be disbursed by the State Treasurer upon order of the Comptroller countersigned by the Governor. (Article IV, s. 4(d) and (e), State Const.; ss. 216.331, 17.03, 18.02, and 18.07, F.S.) Disbursement of such funds to pay legitimate state debts and obligations is accomplished through state warrants (orders) signed by the Comptroller and countersigned by the Governor, generally based upon proper vouchers being submitted by the various state officers, agencies, or departments. Prior to the issuing of any such warrant, the Comptroller is required by the Constitution and statutes to audit the proposed disbursement to insure that it is legal, proper, and authorized by law. (See Florida Development Commission v. Dickinson, 229 So.2d 6; cert. den. 237 So.2d 530; Art. IV, s. 4(d) and (e), supra, and s. 17.03, F.S.) Thus, it is at this juncture that the Comptroller's constitutional and statutory preaudit duty is required to be performed. However, once a revolving or petty cash fund has been established outside of the State Treasury, the Comptroller does not make each individual disbursement, but instead reimburses the fund upon proper vouchers being presented by the state agency, department, or official that had requested that the revolving or petty cash fund be established. This procedure is set forth in s. 216.271(3) and (4), F.S., as follows: (3) Vouchers for reimbursement of expenditures from revolving funds established under this section shall be presented in a routine manner to the state comptroller for approval and payment, the proceeds of which shall be returned to the revolving or petty cash fund involved. (4) The revolving or petty cash fund authorized herein shall be properly maintained and accounted for by the agency requesting same and, upon the expiration of the need therefor, shall be returned in the amount originally established to the appropriate fund for credit to the payments for revolving funds account therein. (Emphasis supplied.) As will be noted, the Comptroller's constitutional and statutory duty to preaudit the requested disbursement, that is to settle and approve accounts against the state, is required to be performed when he reimburses the fund after having been presented proper vouchers. He could not legally reimburse the fund without finding and determining that the moneys requested to be replaced had been properly expended as authorized by law for a legal and proper purpose. You will further note that the statute imposes a statutory duty on the agency requesting the establishment of the fund to properly maintain and account for the moneys in the fund, and to return the moneys in the fund in the amount originally established upon the expiration of the need therefor. This duty is significant when considered in light of the liability of public officers for shortages in their accounts. Florida follows the majority rule as is recognized in the case of Thomas v. Carlton,143 So. 780, wherein the court stated at p. 785: In 17 Ann. Cas. 929, the annotator says: "The great weight of authority sustains the following propositions with respect to the liability of a public officer and his sureties for the loss of public moneys: Where the statute in direct terms or from its general tenor imposes the duty to pay over public money received and held as such and no condition limiting that obligation is discoverable in the statute, the obligation thus imposed and assumed by the officer will be deemed to be absolute, and the fact that the money has been lost either through theft, robbery, bank failure, accidental fire, or other cause, without his fault, does not constitute a defense to an action for its recovery. The rule of the responsibility of a bailee for hire is not applicable to such a case. When the condition of the officer's bond is that he will faithfully discharge the duties of the office, and when the statute, as above stated, imposes the duty of payment or accountability for the money without condition, the obligors of the bond are subject to the same high degree of responsibility. The reasons upon which these propositions rest are to be found in the unqualified terms of the contract and in considerations of public policy." (Emphasis supplied.) At p. 786 the court stated: "We hold with the majority rule as stated in 17 Ann. Cas. 929, hereinabove quoted." The statutory duty to account for and maintain the fund, and to return the fund in the amount originally established, is an absolute duty and is unconditional. The case of Mordt v. Robinson, 156 So. 535, involved a situation where a clerk of the court had been holding moneys in the registry of the court and had deposited such moneys in a state bank which had been officially designated as a lawful depository of public moneys pursuant to the statutes in existence at that time. (Now see Ch. 136 and ss. 659.24, 18.10, and 18.101, F.S., et al.) The bank had subsequently become insolvent and closed. Suit was brought by the individual owning the moneys held by the clerk and deposited in the bank which had closed. In discussing the statute involved as it related to the clerk's liability, the court stated at p. 536: The effect of section 6079, Comp. Gen. Laws, supra, was to give effect in the state of Florida to the established common-law rule of liability of public officers, which is in substance that a public officer occupies merely the position of bailee with reference to funds coming into his custody as a public official, and is to be absolved from liability for loss of such funds if he has exercised due care and diligence by depositing such funds in an officially designated public depositary bank as authorized to be done at his option under our statute. See 5 Ruling Case Law, par. 15, p. 630, for a statement of the commonlaw rule. The court previously had pointed out that the purpose of the statute was to grant a special statutory permission to the various public officers mentioned, to lawfully deposit any moneys which they might receive into their possession or custody, with banking companies organized under the laws of Florida and designated by the Comptroller as official depositaries of public money, but that the statute did not require them to do so. At p. 537 the court stated: Absent our special statute just cited, the effect of our other general statutes imposing a duty upon the clerk of a court to faithfully account for all moneys received and held by him as a public officer, and to give a bond as security therefor, would be, no doubt, to impose an unconditional liability on such officer as an insurer for all money that comes into his hands, because under our general laws the statutory duty to account is an absolute one, fortified by the conditions of many official bonds. 5 R.C.L. par. 15, p. 630. (Emphasis supplied.) Continuing therein, the court stated: The large number of cases cited by appellant as being authorities from other jurisdictions holding to the contrary rule of absolute liability are deemed by us not to be in point, nor applicable to cases like this, where the officer sued is shown to have made his deposits in a public depositary under special statutory authority giving them the special right to do that very thing. In all other cases the weight of authority is undoubtedly to the effect that a clerk of the court or other public officer is liable for all losses resulting from his default with regard to moneys paid into his custody and legally received by him, and we so recognize in view of the following imposing array of decisions on that subject: Thomas v. Carlton, 106 Fla. 648, 143 So. 780; Howard v. United States, 184 U.S. 676, text 683, 22 S.Ct. 543, text 546, 46 L.Ed. 754 . . . . (Emphasis supplied.) It is readily apparent that the moneys which have been lost through error or negligence were not placed in a public depository and accordingly the officer or agency head requesting the revolving or petty cash fund would be liable as an insurer for such moneys since the duty to account is absolute. Upon failure to account, ss. 215.02,215.04, 215.05, and 17.04, F.S., would come into play. The liability of the Clerk III employees will next be considered. It is noted that no claim is made that any crime such as theft or embezzlement is involved and the moneys are missing through only error or negligence. An examination of the statutes reveals no statute applicable to state officers and employees similar to that found in s. 219.03, F.S., which makes provision for the bonding of county deputies and employees handling public money and for the premium of the bond to be charged as an expense of the office. Likewise there is no statutory authority either expressly or impliedly authorizing the withholding of funds from future salaries or retirement benefits of employees employed in food stamp offices where cash shortages attributable to error or negligence have been found. (Compare ss. 112.10, 112.171, and 112.20(5), F.S.) The last mentioned section, s. 112.20(5), specifically provides for forfeiture of accumulated and unused sick leave, and terminal pay therefor, of any employee whose employment is terminated as a result of any of the acts covered in the subsection. Included among such acts is being found guilty in a court of competent jurisdiction of committing, aiding, or abetting any embezzlement or theft from his employer or bribery in connection with the employment, and the act of being found guilty by a court of competent jurisdiction of violating any state law prohibiting strikes by public employees. (See also ss. 122.08(7),122.35(4)(d) and (e), and 121.091(5)(f) and (g), F.S.) Suffice it to say there is no comparable statute to any of those mentioned herein which authorizes the withholding of funds from salary or retirement benefits or contributions expected to be paid to employees (Clerk III's) employed in offices where money is handled for food stamp purposes and where cash shortages due to error or negligence have occurred. The duty to account and maintain is placed squarely on the agency (officer) requesting the establishment of the revolving or petty cash fund. Undoubtedly, this pinpointing of the duty to account for and maintain the fund was the Legislature's way or manner of insuring that the state moneys were properly protected by pinpointing the fiscal responsibility in case of loss through error, negligence, theft, embezzlement, or for any other reason. Next to be examined is the federal food stamp program and the effect of shortages as discussed in your letter if the moneys involved were funds received by such employees in payment for food stamps. Section 409.275, F.S., contains the general authority for the administration of a food stamp program. It does not speak to the liability of state employees working in the food stamp offices for shortages. Chapter 69-268, Laws of Florida, whereby s. 409.275, F.S., was created reveals that Public Law 88-525 of the U.S. Congress established the food stamp program. Chapters 70-201 and 70-255, Laws of Florida, further amended the law, and the former contained a provision appropriating $1,500,000 from the General Revenue Fund to the Department of Health and Rehabilitative Services for the "purposes of this act," such funds being "in addition to all other funds appropriated to the department by any other act of the 1970 legislature." Examination of the federal law, Public Law 88-525, as amended, now embodied in Title 7 U.S.C.A., ss. 2011-2026, reveals no federal provision on the point. Section 2024, as amended, provides: State financing of administrative costs; Federal payments to State agencies; reports on effectiveness of administration of Food Stamp Program; qualified personnel (a) Except as otherwise provided in this section, each State shall be responsible for financing, from funds available to the State or political subdivision thereof, the costs of carrying out the administrative responsibilities assigned to it under the provisions of this Act. (b) The Secretary is authorized to pay to each State agency an amount equal to 50 per centum of all administrative costs, including, but not limited to, the cost of (1) the certification of households; (2) the acceptance, storage, and protection of coupons after their delivery to receiving points within the States; (3) the issuance of such coupons to eligible households; (4) the outreach and fair hearing requirements of section 10 of this Act; and (5) the control and accounting of coupons . . . . (Emphasis supplied.) As can be noted, the state has the responsibility of financing the cost of carrying out the administrative responsibilities of the act, but the secretary (Secretary of Agriculture) is authorized to pay to each state agency 50 percent of all administrative costs. The federal appropriation is contained in s. 2025 thereof. The statefederal relationship on financing is discussed in Stewart v. Butz,491 F.2d 165 (5th Cir.); Bermudez v. United States Department of Agriculture, 490 F.2d 718 (D.C. Cir.) cert. den. 414 U.S. 1104, (1973); and Carter v. Butz, 479 F.2d 1084 (3rd Cir.) cert. den.414 U.S. 1103, (1973). In the Carter case, the court was required to determine whether the state or federal government should bear the loss when, through state administrative error, a recipient failed to receive cards necessary to be entitled to purchase food stamps and thus did not receive food stamps during one card period. It was resolved that the recipient should receive relief and the question of which entity should bear the cost remained. The court, in resolving that the federal government should bear the cost, did an excellent analysis of the food stamp law beginning at p. 1085: Under the Food Stamp Act of 1964 (the Act) and implementing regulations the Food and Nutrition Service of the Department of Agriculture administers a program under which, at the request of the states, low income households within the state are enabled to purchase at a discount from their redeemable value, food stamps which may be used to obtain a nutritionally adequate diet. The amount such householders pay for the food stamps is determined under a sliding scale dependent upon the household's income. Eligibility of certain households, such as welfare recipients is determined at the federal level. Eligibility of other households is determined by the states, under uniform national income and resource standards set forth in the Act and federal regulations. Under the Act, state agencies are responsible for certification of qualifying households, and are also responsible for the issuance of food stamps. 7 U.S.C. § 2019(b); 7 C.F.R. s. 270.3(b). Instructions of the Food and Nutrition Service permit the state agencies to perform the certification responsibility by mailing to eligible households at a specified time twice each month authorization to purchase cards (ATP cards) which disclose the household's "purchase requirement." The "purchase requirement" is the percentage of the face amount of redeemable value which the householder must pay to the issuing state agency for the stamps. The issuing state agency is usually a commercial bank, which deposits the "purchase requirement" to the credit of the United States Treasury. The food stamps are redeemable for eligible food items at face value at participating retail food stores. The stores collect the face value in money at a bank, which in turn is reimbursed at face value by the Treasury through the Federal Reserve System. Thus, the amount of the discount is borne by the Federal Government. While the Federal Government bears the cost of the discount, with certain limited exceptions the participating states are responsible for financing the costs of carrying out their administrative duties under the Act, including the administrative cost of issuing food stamps to eligible households. (Emphasis supplied.)
This explanation is helpful, for your letter does not explain the source of the moneys which are missing. It indicates, however, that it is moneys "received" which are missing, which would seem to be money received by the food stamp office in the purchase of food stamps. If this is so, the money is earmarked to be forwarded through some manner to the United States Treasury as explained in the Carter case. At p. 1087 of said case it is stated: The federal defendants contend that while they have no objection to giving relief to eligible householders who have been deprived of benefits through no fault of their own, the relief should be at the expense of the Commonwealth of Pennsylvania, not at the expense of the United States. They urge that the applicable administrative regulations and instructions establish a thirty-day statute of limitations on federal liability. But because the states are under a general statutory obligation to follow administrative regulations and the instructions of the Federal Nutrition Service, they urge, and in the instant cases failed to do so, the same regulations and instructions provide the predicate for imposing on the states a liability which does not otherwise appear. (Emphasis supplied.) Continuing therein it is stated: The state defendants contend that the Act does not authorize a thirty-day statute of limitations, that the regulations in force at the time of the events in issue do not specify such a period, that there are no state appropriations for the payment of benefits to food stamp eligibles, and that imposition of liability on the Commonwealth is prohibited by its sovereign immunity. Since both the state and the federal defendants concede that the plaintiffs are entitled to relief from some source we are not concerned with an issue over the statutory right of the recipients. (Emphasis supplied.) Further therein it is stated: The only issue is, as between the federal and state governments, which party should be financially responsible for the remedy implied from conceded statutory eligibility. Under the Act, generally speaking, the Federal Government pays for benefits, 7 U.S.C. ss. 2013(a), 2016(d), while the states pay for a portion of administrative costs. 7 U.S.C. ss. 2019(b), 2024(a). The Commonwealth may be held liable to the Federal Government for gross negligence or fraud on the part of its agencies in the certification of applicant households by the face amount of food stamps issued as a result of such fraud in excess of the household's proper eligibility. 7 U.S.C. § 2019(g). The Secretary has a general rulemaking authority under the Act.7 U.S.C. § 2014(c). He has issued regulations implementing7 U.S.C. § 2019(g), which provide for state financial liability to the Federal Government when because of errors by the states, the Federal Government has been charged with coupons which should never have been issued. See 7 C.F.R. s. 271.7. The aim of7 U.S.C. § 2019(g) and of 7 C.F.R. s. 271.7 is to provide indemnity to the Federal Government for "additional" expense which it has incurred as a result of such errors. (Emphasis supplied.) It should be noted that there is a specific federal statute imposing liability on the state in certain situations for gross negligence or fraud on the part of the state agencies. The statute does not cover simple negligence or error and does not extend to employees of the state. The federal regulation mentioned may become significant should the federal government seek to recover from the state for such errors as mentioned in your letter. In this latter regard your attention is invited to s. 2019(b) which requires the designated state agency of each participating state to maintain and keep ". . . such records as may be necessary to ascertain whether the program is being conducted in compliance with the provisions of this chapter and the regulations issued pursuant to this chapter." Such records must be preserved and made available for inspection and audit for a period of time not in excess of 3 years. One final observation of the court in the Carter case deserves mention. At p. 1088 the court stated: When considering whether to construe the Act as permitting the implication of a remedy against the state rather than Federal Government we cannot disregard the fact that Congress has appropriated funds for the payment of the benefits in question, while the states have not. This is not to suggest that it would have been beyond the power of Congress to require as a condition of the states' participation in the program a waiver of sovereign immunity to the extent of retroactive benefits. . . . But nothing in the Act suggests any such congressional intention. (Emphasis supplied.) This observation of the court, and in fact the entire case relating to the state-federal financial relationship, should remain foremost in mind when considering certain specific federal regulations on the subject. Title 7, C.F.R. ss. 271.6(b) and (c) provide: (b) The State agency shall arrange for the prompt verification of and receipting for the contents of each coupon shipment. (c) The State agency shall arrange for: (1) The adequate safekeeping of its supplies of coupons; (2) The maintenance of a reasonable working inventory of coupons; (3) The ordering of coupons; and (4) The maintenance of proper inventory and accounting controls for such coupons. (Emphasis supplied.) As can be noted, the federal regulation imposes upon the state agency the responsibility for arranging for adequate safekeeping for the coupons received from the federal government and requires the state agency to maintain proper inventory and accounting controls for such coupons. Section 271.6(a) of said regulation points out that in the course of shipment from the federal agency to the state agency, the risk of loss of any coupons during shipment is borne by the federal agency and not the state agency so the previously quoted state requirements have the effect of imposing the risk of loss after receipt on the state agency. Section 271.6(d) of said rule provides: (d) The State agency or the State issuing agency shall arrange for the issuance of coupons to eligible households and for the collection of sums required from eligible households for the purchase requirement. The coupon allotment to be issued to any household, shall be in the amount determined in accordance with s. 271.5. (Emphasis supplied.) This section imposes the duty on the state agency or the state issuing agency to arrange for the collection of the sums required for the purchase of food stamps. The risk of loss of coupons is discussed again in s. 271.6(d)(1) wherein the rule provides that the state agency may issue coupons through the facilities of the U.S. mail, and that unless the federal agency notifies the state agency to the contrary, the federal agency will accept the risk of loss of nondelivery of coupons to eligible households after deposit of such coupons in the mail, providing that the coupons are mailed in accordance with instructions provided by the federal agency (FNS). Section 271.6(e) allows the state agency to authorize, under written agreement with public or private agencies, the acceptance of vouchers or warrants issued by such agency in payment for coupon allotments issued to eligible households, and requires that such vouchers or warrants be converted into cash as soon as practicable thereafter. Section 271.6(f) provides: The State agency shall arrange for the reconciliation of coupon inventories, coupon issuances, sums collected from eligible households, vouchers, warrants accepted from public or private agencies, and other receipts. All such receipts shall be safeguarded at all times and promptly deposited. In any issuance system utilizing ATP cards, coupon issuances shall further be reconciled to the master file of certified eligible households. (Emphasis supplied.) This regulation mandates that the state agency is to arrange for a reconciliation of coupon inventories, coupon issuances, and sums collected and requires that all such receipts be safeguarded at all times and promptly deposited. It is readily apparent that a prime thrust of this regulation is to place the responsibility for sums collected from eligible households on the state agency. This is further recognized in s. 271.6(h) which provides: Every official or employee, except officials and employees of the U.S. Postal Service, who is responsible for receiving and issuing coupons or accepting cash or other receipts from eligible households shall be covered by an appropriate form of surety bond in favor of the State agency or the State issuing agency. The amount of such surety bonding shall be adequate to protect the financial interests of the State agency in case of loss. (Emphasis supplied.) This regulation requires that the state agency see to it that every official or employee responsible for receiving and issuing coupons or accepting cash or other receipts is covered by an appropriate form of surety bond to protect the financial interest of the state agency in case of loss. Presumably the Department of Health and Rehabilitative Services has complied with this regulation and all such officials and employees have been appropriately bonded. It is noted that the regulation does not qualify the language "in case of loss" and accordingly such term would appear to embrace all losses and not only those occurring through employee or official infidelity. Title 7, C.F.R. s. 271.7, relates to the financial liabilities of the state agency and dovetails with s. 271.6, previously discussed, whose title pointed out that that section related to methods of distributing, issuing, and accounting for coupons and receipts. Previously herein it was pointed out that there was a federal statute relating to the liability of the state agency where there had been gross negligence or fraud on the part of the state agency. Section 271.7(a) is the federal regulation implementing the law and provides: If FNS determines that there has been gross negligence or fraud on the part of the State agency in the initial certification of households, any subsequent certification of households, or the issuance of coupons, the State shall, on demand by FNS, pay to FNS a sum equal to the amount of any free coupons issued as a result of such negligence or fraud. Gross negligence shall include those State agency actions in connection with certification and coupon issuance which are in substantial noncompliance with the provisions of this subchapter and which result in a loss of Federal funds. It shall also include those State agency actions with respect to certification and coupon issuance which would not be considered grossly negligent in themselves, but which, after previous admonition by FNS and the lapse of a reasonable period of time to take corrective measures, continue to result in substantial losses of Federal funds. (Emphasis supplied.) It is quite clear that the state agency is held liable under the rule where gross negligence or fraud exists in the handling of coupons and certifications as discussed therein which has resulted in loss of federal funds. The regulation also discusses situations which are deemed to be gross negligence. Section 271.7(b) is particularly pertinent to your inquiry. It provides: If FNS determines that there has been a loss of coupons distributed to the State agency, or of the sums required to be collected by it in payment of the purchase requirement, including the cash equivalent of any vouchers or warrants accepted by it in accordance with s. 271.6(c), including, but not limited to coupons or funds lost as a result of thefts, embezzlements or unexplained causes, the State agency shall, on demand by FNS, pay to FNS the face amount of any such coupons, and the amount of such cash or cash equivalent. Coupons which are lost will be presumed to have been redeemed in the customary channels of redemption: Provided, that the State agency will be relieved of liability for such coupons which it establishes to the satisfaction of FNS were recovered or destroyed prior to presentation for redemption. (Emphasis supplied.) This regulation requires the state agency to pay to the federal agency (FNS) the face amount of any such coupons lost and the amount of such cash or cash equivalent lost. The "loss" includes loss as a result of theft, embezzlement, or unexplained causes, but is not limited thereto. Undoubtedly the purpose of the bonding requirements found in s. 271.6(h) was to protect the state's interest should the federal agency demand payment for loss from the state. Section 271.7(c) also speaks to the state's liability where there has been overissuance of coupons or undercollection of cash as a result of mathematical or changemaking errors by personnel of any issuing office. These regulations would appear to provide for the situation discussed in your letter where through error or negligence a food stamp shortage or cash shortage or overage has been found to exist.